**Williams C. HALL and Jean G. Hall, Plaintiffs-Appellants,**

v.

**CITY OF SANTA BARBARA, Defendant-Appellee.**

No. 85–5838.

United States Court of Appeals, Ninth Circuit.

Argued March 5, 1986.

Submitted April 11, 1986.

Decided Aug. 22, 1986.

As Amended March 9, 1987.

Opinion on Denial of Rehearing and Rehearing En Banc March 9, 1987.

Robert J. Jagiello, Santa Monica, Cal., for plaintiffs-appellants.

David B. Koff, Latham & Watkins, Los Angeles, Cal., for amicus curiae plaintiffs-appellants.

Steven A. Amerikaner, City Atty., Santa Barbara, Cal., for defendant-appellee.

Michael Jenkins, City Atty. of the City of Westlake Village, Richards, Watson, Dreyfuss & Gershan, Los Angeles, Cal., for amicus curiae defendant-appellee.

Before SNEED and KOZINSKI, Circuit Judges; and SOLOMON,* District Judge.

## AMENDED OPINION

KOZINSKI, Circuit Judge.

We review the district court's dismissal of plaintiffs' lawsuit seeking compensation for an alleged taking of property resulting from the operation of Santa Barbara's mobile home rent control ordinance.

### Facts

Williams and Jean Hall own and operate the Los Amigos Mobile Home Estates, a mobile home park within the City of Santa Barbara. They provide tenants a plot of land and access to certain amenities such as water and electricity. Tenants install mobile homes, paying rent for use of the land and facilities.

Mobile homes are mobile only in the sense that they are not permanently anchored to a foundation. However, many mobile homes have no wheels and bear no other close resemblance to a motor vehicle. Nevertheless, in California they must display motor vehicle license plates, Cal.Veh. Code § 5352 (West 1971 & Supp.1986), and are considered personal property (exempt from real property tax). Cal.Rev. & Tax. Code § 5810 (West Supp.1986).

While tenants are free to remove their mobile homes when they move, in practice they rarely do so. California law normally prohibits mobile park operators from forcing tenants to remove mobile homes. Cal. Civ.Code § 798.73 (West 1982 & Supp. 1986). Tenants typically sell their homes to buyers who then succeed them as tenants of the mobile home park.

In August 1984 the City of Santa Barbara enacted a rent control ordinance applicable to mobile home parks. Santa Barbara, Cal., City Council Ordinance No. 4285, ch. 26.08 (Aug. 14, 1984) (hereinafter S.B.Ord.) The ordinance requires mobile park operators to offer their tenants leases of unlimited duration. These leases must provide certain key terms: They must be terminable by the tenants at will,[1] but by

---

* The Honorable Gus J. Solomon, Senior United States District Judge for the District of Oregon, sitting by designation.

1. While this is not explicitly stated in the ordinance, it appears implicit in the regulatory scheme and has been so treated by the parties. See S.B.Ord. § 26.080.040A. As with much else on this record, we have to surmise what remedies the ordinance may give the landlord in case of a tenant's untimely termination of the lease.

the mobile home operator only for cause, narrowly defined by the ordinance;[2] rent increases are strictly limited;[3] and disputes about rent or lease terms are made subject to binding arbitration. S.B.Ord. § 26.08.040.

The Halls brought this action under 42 U.S.C. § 1983,[4] claiming that the ordinance effected a taking of their property and that such taking was neither for a public purpose nor justly compensated. Plaintiffs' claim was a novel one: they argued that by giving tenants the right to a perpetual lease at a below-market rental rate, the ordinance transfers to each of them a possessory interest in the land on which their mobile home is located. According to the Halls, this interest has a market value and a market: the market for mobile homes located in mobile home parks. According to the Halls, the price of mobile homes in their park shot up dramatically after enactment of the ordinance, with many selling far above their blue book value.[5] They claim that the substantial premium paid for mobile homes in parks subject to the Santa

Barbara Ordinance reflects the transfer of a valuable property right to occupy mobile home parks at below-market rates.

■ The City of Santa Barbara filed a motion to dismiss and the Halls filed an opposition.[6] At a hearing held on April 15, 1985, the district court granted the motion.[7] The Halls appealed.

### Discussion [8]

■ It is axiomatic that "[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." 5 C. Wright & A. Miller, *Federal Practice & Procedure*, Civil § 1357, at 598 (1969).[9] This admonition is perhaps nowhere so apt as in cases involving claims of inverse condemnation where the Supreme Court itself has admitted its inability "to develop any 'set formula'" for determining when compensation should be paid, *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), resorting instead to "essentially ad hoc, factual inquiries" to resolve this difficult question. *Mac-*

---

2. A lease may be terminated only for one of the following reasons: (1) failure to comply with a local or state mobile home regulation; (2) conduct that constitutes substantial annoyance to other residents; (3) failure to comply with lease provisions or reasonable park rules; (4) nonpayment of rent, utility charges or reasonable service charges; (5) condemnation of the park; (6) change in use of the park in accordance with California Civil Code Section 798.56(f); (7) cessation of occupancy by the tenant. S.B.Ord. § 26.08.040A.

3. A park owner may unilaterally increase the rent once a year by three percent or by three-quarters of the increase in the Consumer Price Index, whichever is greater. S.B.Ord. § 26.080.-040C. If the owner seeks a larger increase, he must submit his request to arbitration. *Id.* § 26.080.040C, D. In addition, whenever the space becomes vacant, the landlord may raise the rent by up to 10%.

4. The City of Santa Barbara is a "person" amenable to suit under 42 U.S.C. § 1983. *Owen v. City of Independence*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980).

5. The blue book is the Kelley Blue Book for Manufactured Housing (Mobile Homes), published by the Kelley Blue Book Company of Costa Mesa, California. Like the similar blue book for automobiles, it is the standard reference for prices of mobile homes.

6. Although the Halls' complaint was somewhat elliptical, the opposition to the motion to dis-

miss fairly advised defendant and the district court as to the nature of plaintiffs' claim. Under such circumstances, leave to amend the complaint, rather than dismissal, is the appropriate course of action. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Scott v. Eversole Mortuary*, 522 F.2d 1110 (9th Cir.1975). We believe the district court abused its discretion by dismissing rather than giving plaintiffs an opportunity to amend the complaint.

7. Because the district court did not prepare a written opinion, we would have found it useful to review a transcript of the hearing on the motion to dismiss, and particularly the district judge's bench ruling. Unfortunately, neither party made a transcript available.

8. A dismissal for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6) is a ruling on a question of law and as such is reviewable de novo. *Guillory v. County of Orange*, 731 F.2d 1379, 1381 (9th Cir.1984).

9. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). All allegations of material fact are taken as true and construed in the light most favorable to the non-moving party. *Sanders v. Kennedy*, 794 F.2d 478, 481 (9th Cir.1986); *North Star Int'l v. Arizona Corp. Comm'n*, 720 F.2d 578, 580 (9th Cir.1983).

*Donald, Sommer & Frates v. Yolo County,* — U.S. —, —, 106 S.Ct. 2561, 2566–67, 91 L.Ed.2d 285 (1986); *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979). While dismissal of a complaint for inverse condemnation is not always inappropriate, such a dismissal must be reviewed with particular skepticism to assure that plaintiffs are not denied a full and fair opportunity to present their claims. *See Whitney Benefits, Inc. v. United States,* 752 F.2d 1554, 1558–60 (Fed.Cir.1985); *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983).

■ In adjudicating a claim such as that presented by the Halls the court must resolve three questions: (1) Did the governmental action amount to a taking of property? *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1000, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984). (2) Did it advance a legitimate governmental interest? *See, e.g., Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). (3) Was there just compensation? *See, e.g., Kaiser Aetna,* 444 U.S. at 179–80, 100 S.Ct. at 392–93. If the first question is answered in the affirmative and either of the remaining two in the negative, plaintiffs prevail; otherwise they lose. In determining whether plaintiffs' case was properly dismissed, we examine each of these issues in turn, assuming, of course, that plaintiffs' allegations are all true.

### 1. Was There a Taking of Property?

■ Supreme Court cases addressing this question can be divided into two lines of authority: [10] the so-called regulatory taking cases [11] and the physical occupation cases.[12] Regulatory taking cases are those where the value or usefulness of private property is diminished by regulatory action not involving a physical occupation of the property. A typical case of this sort is *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), where New York City prohibited Penn Central from building a 55–story office tower over its Grand Central Terminal. Despite the drastic diminution in the value and usefulness of Penn Central's property, the Court held that the city's action did not amount to a taking.

Physical occupation cases are those where the government physically intrudes upon private property either directly or by authorizing others to do so. A typical case is *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), where New York City authorized Teleprompter to string 36 feet of one-half inch coaxial cable and place two switchboxes, all amounting to about one and one half cubic feet, on a private building. Despite the minimal burden placed on the property owner, the Court in *Loretto* held that a taking had occurred.

■ As *Penn Central* and *Loretto* demonstrate, the Court reaches dramatically different results depending on whether it concludes that a particular governmental action amounts to a physical occupation of property or merely a regulation. *See* R. Epstein, *Takings* 49–50, 94 (1985) (herein-

**10.** The Court noted the existence of these two lines of authority in *Loretto v. Teleprompter Manhattan CATV Corp.:*

Since these early cases, this Court has consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation.

458 U.S. 419, 428, 102 S.Ct. 3164, 3172, 73 L.Ed.2d 868 (1982).

**11.** *E.g., United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985); *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985); *San*

*Diego Gas & Elec. Co. v. City of San Diego,* 450 U.S. 621, 101 S.Ct. 1287, 67 L.Ed.2d 551 (1981); *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); *Goldblatt v. Town of Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922).

**12.** *E.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979); *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946); *Richards v. Washington Terminal Co.,* 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088 (1914).

after Epstein).[13]  As the Court explained in *Loretto,* the distinction lies in the fact that "a physical invasion [of property] is a government intrusion of an unusually serious character" for purposes of the taking clause.  458 U.S. at 433, 102 S.Ct. at 3175 (footnote omitted).  Indeed, "a permanent physical occupation is a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine," *id.* at 432, 102 S.Ct. at 3174 (footnote omitted), and "without regard to the public interests that it may serve." *Id.* at 426, 102 S.Ct. at 3171.  Elsewhere the Court noted that "when the 'character of the governmental action,' *Penn Central,* 438 U.S., at 124, 98 S.Ct., at 2659, is a permanent physical occupation of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." *Loretto,* 458 U.S. at 434–35, 102 S.Ct. at 3175–76. *See also Kaiser Aetna,* 444 U.S. at 179–80, 100 S.Ct. at 392–93 ("the 'right to exclude,' so universally held to be a fundamental element of the property right, falls within this category of interests that the Government cannot take without compensation").

█  When viewed in the light most favorable to the Halls, the allegations of the complaint seem to present a claim for taking by physical occupation, as in *Loretto, Kaiser-Aetna* and their precursors.  Reduced to its essentials, appellants' claim is that the Santa Barbara ordinance has transferred a possessory interest in their land to each of their 71 tenants; that this interest consists of the right to occupy the property in perpetuity while paying only a fraction of what it is worth in rent; and that this interest is transferable, has an established market and a market value.  If proven, appellants' claims would amount to the type of interference with the property owner's rights the Court described so eloquently in *Loretto. See Fresh Pond Shopping Center, Inc. v. Callahan,* 464 U.S. 875, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983) (Rehnquist, J., dissenting from dismissal for want of substantial federal question).[14]

█  The right to occupy property in perpetuity is surely the type of interest that is protected by the taking clause.[15] *See United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945).  Moreover, certain features of the Santa Barbara ordinance, and the way it is alleged to operate, make it peculiarly susceptible to the claim presented by the Halls.  Thus, the ordinance directs the landlord to give tenants a lease, a recognized estate in land, lasting indefinitely.[16]  Moreover, the landlord's residual

**13.** Commentators have criticized this physical invasion/regulation distinction. *See* Epstein at 49–50; Blume & Rubinfeld, *Compensation for Takings: An Economic Analysis,* 70 Cal.L.Rev. 569, 574–75 (1984). Nevertheless, we are bound to respect the distinction as drawn by the Supreme Court.

**14.** As appellee points out, Justice Rehnquist's lone dissent in *Fresh Pond* suggests that the other Justices did not share his ultimate conclusion that the rent control scheme there constituted a taking. However, as discussed below, *see* pp. 205–06 *infra, Fresh Pond* is distinguishable from this case in material ways that we presume were the basis for the majority's decision. We do not interpret the *Fresh Pond* dismissal as repudiating everything said by Justice Rehnquist in his dissent.

**15.** Professor Michelman notes as follows in his seminal article on this subject:

[t]he one incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, "regularly" use, or "permanently" occupy, space or a thing which theretofore was understood to be under private ownership.

Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv.L.Rev. 1165, 1184 (1967), *quoted with approval in Loretto,* 458 U.S. at 427 n. 5, 102 S.Ct. at 3171 n. 5.

**16.** S.B.Ord. § 26.080.050A. We find entirely unpersuasive the city's argument that the ordinance does not give tenants any rights in the landlord's property because the parties are free to change the terms of the lease by mutual consent. That tenants may waive the rights provided for them by the ordinance does not render those rights any less real or valuable. Presumably tenants forego a statutory lease only if the landlord offers them something better. A right is no less a right because it can be traded for something else. Indeed, the contrary is true.

rights in the property are largely at the mercy of his tenants; he loses practically all right to decide who occupies the property, and on what terms. If a tenant moves, the tenant alone decides who will be his successor by selecting the buyer for his rental unit; the landlord has no meaningful say as to who will live on the property, now or in the future.

■ Moreover, because of the way the ordinance is alleged to operate, the tenant is able to derive an economic benefit from the statutory leasehold by capturing a rent control premium when he sells his mobile home. In effect, the tenant is given an economic interest in the land that he can use, sell or give away at his pleasure; this interest (or its monetary equivalent) is the tenant's to keep or use, whether or not he continues to be a tenant. If the Halls' allegations are proven true, it would be difficult to say that the ordinance does not transfer an interest in their land to others. *See also* pp. 205–06 *infra.*

*Loretto*'s explanation as to why a physical invasion of property is such a serious interference with the property owner's rights strongly supports the Halls' claim that they suffered a taking:

Property rights in a physical thing have been described as the rights "to possess, use and dispose of it." *United States v. General Motors Corp.*, 323 U.S. 373, 378 [65 S.Ct. 357, 359, 89 L.Ed. 311] (1945). To the extent that the government permanently occupies physical property, it effectively destroys *each* of these rights. First, the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space. The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights. See *Kaiser Aetna*, 444 U.S., at 179–180 [100 S.Ct., at 392–93]; see also Restatement of Property § 7 (1936). Second, the permanent physical occupation of property forever denies the owner any power to control the use of the property; he not only cannot exclude others, but can make no nonpossessory use of the property. Although deprivation of the right to use and obtain a profit from property is not, in every case, independently sufficient to establish a taking, see *Andrus v. Allard*, [444 U.S. 51] at 66 [100 S.Ct. 318 at 327, 62 L.Ed.2d 210], it is clearly relevant. Finally, even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property.

*Loretto*, 458 U.S. at 435–36, 102 S.Ct. at 3176 (emphasis original; footnote omitted).

■ Appellee's arguments supporting the district court's dismissal are not persuasive. Thus, it does not matter that the tenants' right to occupy space in the Los Amigos Home Estates is not truly perpetual because the ordinance might someday be repealed. A governmental taking can always be undone if the government so chooses. That has never defeated a taking claim. *See, e.g.,* cases cited nn. 201–02 *supra. See also San Diego Gas & Elec. Co. v. City of San Diego*, 450 U.S. 621, 656–57, 101 S.Ct. 1287, 1306–07, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting).[17] Nor does the fact that tenants may be removed for cause, *see* p. 200 & n. 2 *supra*, defeat the Halls' claim. The ability to remove tenants for cause may lessen somewhat the economic impact of the Santa Barbara ordinance; it does not change the fact that tenants are given an indefeasible right to possession so long as they pay the controlled rent and behave themselves.

■ Nor does it matter that the physical occupation here is by tenants and not by the City of Santa Barbara itself. The Court addressed this point in *Loretto*,

---

**17.** Two commentators have addressed a closely related problem in the following terms:

The Supreme Court ... holds that it is the rights of the *property owner,* not the rights of the *property,* that have significance.

To account for those rights, one must abandon abstract calculations which obfuscate the problem by attempting to relate use prohibitions for periods of years to the perpetual life of the realty. Instead, one must examine the hardship placed on individuals by such actions. Sometimes delay in ability to use property leads to foreclosure. Sometimes the owner dies. Given the reality of inflation, the cost of developing the property may increase. Real estate taxes continue to be demanded, often by the entity which is preventing the property from being used.

Berger & Kanner, *Thoughts on The White River Junction Manifesto: A Reply to the "Gang of Five's" Views on Just Compensation for Regulatory Taking of Property,* 19 Loyola L.A.L.Rev. 685, 744–45 (1986) (emphasis original; footnotes citing examples omitted).

holding that "[a] permanent physical occupation authorized by state law is a taking without regard to whether the State, or instead a party authorized by the State, is the occupant." 458 U.S. at 433 n. 9, 102 S.Ct. at 3174 n. 9; *see* Epstein at 187. Also put to rest by *Loretto* is the notion that the physical occupation is not permanent where the landlord could evict the tenants by going out of business.[18] The Court gave short shrift to this argument, noting that "a landlord's ability to rent his property may not be conditioned on his forfeiting the right to compensation for a physical occupation." *Loretto*, 458 U.S. at 439 n. 17, 102 S.Ct. at 3178 n. 17.

The city's argument that appellants are adequately compensated by the rents they receive is irrelevant to the determination of whether a taking has occurred. *See Troy Ltd. v. Renna*, 727 F.2d 287, 300 (3d Cir.1984). Whether compensation is adequate is an inquiry separate from whether there has been a taking. In *Loretto*, for example, state law provided for compensation. The Court nevertheless determined that there was a taking through physical occupation. It left it to the state courts to determine whether the compensation provided was adequate. 458 U.S. at 441, 102

S.Ct. at 3179. We address this question below. *See* p. 208 *infra*.

Finally, the city cites various cases,[19] some of them decided since *Loretto*,[20] where rent control statutes or ordinances have been upheld. Essentially, the city suggests that, whatever the applicability of taking law to other governmental actions, rent control is conclusively constitutional. We cannot agree. In light of the Supreme Court's own unwillingness to provide any hard and fast rules in this sensitive area, we cannot indulge the notion that a city may eviscerate a property owner's rights and shield its action from constitutional scrutiny by calling it rent control.[21]

We have examined the cases cited by the city and find them distinguishable in a way we think the Supreme Court would find material. In none of the cited cases has the landlord claimed that the tenant's right to possess the property at reduced rental rates was transferable to others, that it had a market value, that it was in fact traded on the open market and that tenants were reaping a monetary windfall by selling this right to others.

---

18. In any case, we note some skepticism as to whether this is an option realistically available to the Halls. State and local laws seem to pose considerable obstacles to going out of the mobile park business. State law allows the mobile park owner to evict tenants in order to put the park to a different use only upon giving six months' notice; such notice may only be given after all necessary local permits have been obtained. Cal. Civil Code § 798.56(f). Santa Barbara in turn requires that a mobile home park owner obtain a permit to convert a park to another use. Santa Barbara, Cal., Municipal Code ch. 28.78.010 (1984). An applicant for such a permit must file a plan outlining the use to which the property is to be put, describing the impact of the removal on displaced residents, and disclosing the relocation assistance to be provided. *Id.* ch. 28.78.040. Any such plan must be approved by the city's Community Development Department. *Id.* ch. 28.78.050.

19. *See, e.g., Block v. Hirsh*, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921) (upholding District of Columbia rent control ordinance as a temporary measure); *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 68 S.Ct. 421, 92 L.Ed. 596 (1948) (upholding rent limits on certain accommodations in "defense-rental areas" as a valid exercise of the war power).

20. *See, e.g., Fisher v. City of Berkeley*, 471 U.S. 1124, 105 S.Ct. 2653, 86 L.Ed.2d 270 (1985) (dismissing appeal of ruling that rent control

statute need not provide landlord a reasonable return on his investment); *Fresh Pond Shopping Center, Inc. v. Callahan*, 464 U.S. 875, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983) (dismissing appeal of ruling upholding rent control statute limiting right to remove a tenant for personal use of rental unit); *Troy Ltd. v. Renna*, 727 F.2d 287 (3d Cir.1984) (upholding New Jersey law prohibiting eviction of certain older tenants from apartments converted to condominiums).

21. *Troy Ltd. v. Renna*, 727 F.2d 287 (3d Cir. 1984), does contain language suggesting that a rent control ordinance can never constitute a taking because occupancy of the property by tenants is a private rather than a public use for purposes of the taking clause. *Id.* at 301–03. This attempt to distinguish *Loretto* was effectively overruled by *Hawaii Housing Authority v. Midkiff*, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), which squarely held that transferring property "in the first instance to private beneficiaries does not condemn that taking as having only a private purpose." 467 U.S. at 243–44, 104 S.Ct. at 2330–31.

In any case, *Troy* must be read in light of its facts, which are materially distinguishable from ours. *See, e.g.*, n. 22 *infra*. Despite the broad language used in the opinion, we doubt that the *Troy* court would conclude that government may take private property from one person and give it to another without implicating the taking clause.

This is not a minor difference; it is crucial. The fact that the tenant can sell his interest to third parties drastically affects the economic realities of the landlord/tenant relationship. The typical rent control statute modifies the landlord/tenant relationship somewhat to protect tenants from perceived evils of the free-enterprise system. *But see* n. 26 *infra.* By contrast, the Santa Barbara Ordinance, as it is alleged to operate, changes the fundamental relationship between the parties, giving landlord and tenant complementary estates in the same land. On the one hand, the landlord loses forever a fundamental aspect of fee simple ownership: the right to control who will occupy his property and on what terms. On the other hand, the tenant gets an interest that he can liquidate and take with him when he leaves the property, or even the City of Santa Barbara.

That tenants normally cannot sell their rights in rent controlled property provides important safeguards for landlords. Tenants, like the rest of us, are not immortal; nor are they immune to the normal familial and economic pressures that occasion vacancies even in rent controlled housing.[22] If they are denied the right to cash out, tenants can enjoy the benefits of rent control only so long as they remain tenants,

not beyond. When the premises become vacant, the landlord is able to reassert a measure of control over the property. He may chose to occupy it himself; or to allow a friend or relative to stay there; or to keep it vacant; or make improvements in the hope of raising the rent to the extent allowed by law; or to rent it to a new tenant, presumably making the selection on the basis of factors that will maximize his total return from the property.[23] Between tenants, the landlord can thus assert important prerogatives as property owner and make significant decisions as to the property's use. The tenant, for his part, must make difficult choices: if he wants the benefits of the rent control ordinance, he must stay put. If he wants to leave, he must give up a good thing.[24]

In short, under a rent control scheme where the tenant is not allowed to monetize his rights, benefits and burdens are shifted somewhat between landlord and tenant, but neither gets the full bundle of sticks. By contrast, as the Santa Barbara ordinance is alleged to operate, landlords are left with the right to collect reduced rents while tenants have practically all other rights in the property they occupy. As we read the Supreme Court's pronouncements,

---

**22.** This was a key point supporting the court's conclusion that no taking had occurred in *Troy,* a case on which the city relies heavily. *Troy* noted that "[m]ost tenants with a protected status will be 70 years of age (or, if surviving spouses, 58 years of age) before the Tenancy Act comes into play. It is fanciful to imagine that these tenants will occupy their units 'permanently.' Moreover, the tenancies may terminate by virtue of changing income levels or principal residences, and tenants may be evicted on any of thirteen grounds." 727 F.2d at 301.

**23.** Even if the property owner may not increase his monetary income by raising the rent, his choice of tenants may increase his economic return in some other fashion. Thus, he may choose tenants with smaller families over those with larger ones, on the theory that fewer people place less of a strain on the mobile park's resources. For similar reasons, he may prefer families without pets and those where the breadwinner travels a lot. On the theory that frequent vacancies increase his control over the property, or allows for faster rent increases (*see* S.B.Ord. § 26.080.060), he may well prefer older tenants to younger ones.

In addition to selecting on the basis of factors that enhance his economic return, the landlord may also select on the basis of noneconomic factors that nevertheless increase the total benefit he derives from the property. *See* A. Alchian

& W. Allen, *University Economics* 146 (3d ed. 1972) (hereinafter Alchian & Allen). Thus, landlords may select attractive pleasant applicants over slovenly belligerent ones, and nonsmoking teetotalers over smokers who drink.

The landlord's ability to exercise these choices with respect to the property is an important attribute of ownership and allows him to retrieve, in some measure, the monetary loss he suffers as a result of rent control. To the extent these choices are narrowed or eliminated altogether, the burden on the landlord is increased and his essential attributes of ownership are eroded until they become illusory.

**24.** The inability of tenants to transfer rights in rent controlled property no doubt creates market inefficiencies. *See* Alchian & Allen at 154; P. Samuelson & W. Nordhaus, *Economics* 393–94 (12th ed. 1985); Muth, *Redistribution of Income Through Regulation in Housing,* 32 Emory L.J. 691, 694–95 (1983). However, "[n]othing in economic analysis warrants a judgment about which allocative procedures are good or bad. That judgment must be based on criteria derived from other sources." Alchian & Allen at 154. Here, the very fact of the inefficiency—that the tenant is not given too great a stake in the property—saves most rent control schemes from potential unconstitutionality. After all, efficiency would be maximized by giving the tenant a fee simple interest in the property.

score; we merely hold that the issue must be considered and addressed by the district court on the basis of a complete record.[26] this oversteps the boundaries of mere regulation and shades into permanent occupation of the property for which compensation is due.

### 2. Did the Ordinance Substantially Advance a Legitimate State Interest?

■ We first note a potentially significant difference in the standard by which governmental action must be adjudged depending on whether it is a deliberate exercise of the eminent domain power or regulatory action that results in an incidental taking. In *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), the Court explored the meaning of the "public use" requirement in the fifth amendment's eminent domain clause. The Court held that "[t]he 'public use' requirement is ... coterminous with the scope of a sovereign's police powers." 467 U.S. at 240, 104 S.Ct. at 2329. The Court also held that it would not "substitute its judgment for a legislature's judgment as to what constitutes a public use 'unless the use be palpably without reasonable foundation.'" 467 U.S. at 241, 104 S.Ct. at 2329 (quoting *United States v. Gettysburg Electric R.R.,* 160 U.S. 668, 680, 16 S.Ct. 427, 429, 40 L.Ed. 576 (1896)).

The Court in *Midkiff* did not address the somewhat different articulation of the standard applicable in cases where there was no deliberate exercise of the eminent domain power. For example, it did not mention *Agins v. City of Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), where it had noted that "[t]he application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests...." *Id.* at 260, 100 S.Ct. at 2141 (citing *Nectow v. City of Cambridge,* 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928); *see also United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985)

(citing *Agins*); *Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981) (same). The *Midkiff* Court left open the possibility that less deference would be afforded where government does not intend to effect a taking than where it does. *See Midkiff,* 467 U.S. at 241, 104 S.Ct. at 2329–30 (distinguishing *Missouri Pacific R.R. v. Nebraska,* 164 U.S. 403, 416, 17 S.Ct. 130, 135, 41 L.Ed. 489 (1896), on the ground that "the 'order in question was not, *and was not claimed to be* [emphasis original], ... a taking of private property for a public use under the right of eminent domain'").[25]

Even under the deferential *Midkiff* standard, public use is not established as a matter of law whenever the legislature acts. While the scope of judicial scrutiny is narrow, "[t]here is, of course, a role for courts to play in reviewing a legislature's judgment of what constitutes a public use, even when the eminent domain power is equated with the police power." *Midkiff,* 467 U.S. at 240, 104 S.Ct. at 2329. The test appears to be whether the legislature chose an objective that is within its authority under the police power, and whether it "*rationally could have believed* that the [Act] would promote its objective." 467 U.S. at 242, 104 S.Ct. at 2330 (emphasis original) (quoting *Western & Southern Life Insurance Co. v. State Board of Equalization,* 451 U.S. 648, 671–72, 101 S.Ct. 2070, 2084–85, 68 L.Ed.2d 514 (1981)). The test in inverse condemnation cases may well be more stringent.

Here, the Santa Barbara City Council enacted the ordinance to alleviate what it perceived as "a critical shortage of low and moderate income housing." S.B.Ord. § 26.-08.020A. If appellants' allegations are substantiated, there would be significant doubt whether these purposes are achieved, or could rationally be thought achievable, by means of the ordinance.

■ If appellants are able to prove their allegations, it would seem that the Santa Barbara ordinance will do little more than give a windfall to current mobile park tenants at the expense of current mobile park owners. If, as appellants allege, the

---

**25.** It makes considerable sense to give greater deference to the legislature where it deliberately resorts to its eminent domain power than where it may have stumbled into exercising it through actions that incidentally result in a taking. In the former case, the court is validating the will of the legislature; in the latter, it may be thwarting the legislative will by ordering compensation where the legislature had no intention of engaging in a compensable transaction.

ordinance has resulted in a substantial increase in the market price of mobile homes subject to the ordinance, this may well hinder rather than assist lower-income families seeking access to rental units in mobile park homes. We express no view on this score; we merely hold that the issue must be considered and addressed by the district court on the basis of a complete record.[26]

### 3. Was Adequate Compensation Paid?

The adequacy of compensation, if any, paid to appellants is yet another inquiry fraught with factual uncertainty. The city would short-circuit this process by arguing that appellants are adequately compensated because they are entitled to rent that assures them a fair return on their investment. That, however, is not the test in cases involving a claim of taking by physical invasion, as opposed to mere regulation. For example, Mrs. Loretto's claim was not defeated because she continued to collect rents on the apartment building upon which the cable was strung. See *Loretto*, 458 U.S. at 442, 102 S.Ct. at 3179–80.[27]

■■■■■ Here, the rental payments compensate the Halls for use of the land during the rental period, plus whatever amenities they provide tenants. However, if their claim is substantiated, the Halls are entitled to additional compensation for the taking of their property: the possessory interest in the land allegedly transferred to each of their tenants. It may well be that the rental payments (together with such increases as are permitted under the ordinance) adequately compensate the Halls for the taking of their property. However, this cannot be assumed; it must be proven. To make this determination, the court must ascertain the value of the interest allegedly transferred to each tenant and the value of what the Halls received, if anything, in addition to normal rental payments. All these are matters that must be considered by the district court on remand.[28]

26. We also note what appears to be a growing consensus that "rent control causes a reduction in the quality of the existing rental housing stock and discourages investment in new rental property," actually exacerbating the problems it is intended to ameliorate. The Report of the President's Commission on Housing 91 (1982). *See, e.g.,* P. Samuelson & W. Nordhaus, *Economics* 393–94 (12th ed. 1985); W. Baumol & A. Blinder, *Economics: Principles and Policy* 62–64 (3d ed. 1985); Muth, *supra* note 24, at 693–98; *cf.* Frey, Pommerehne, Schneider & Gilbert, *Consensus and Dissension Among Economists: An Empirical Inquiry,* 74 Amer.Econ.Rev. 986, 988, 991 (1984) (fewer than 2 percent of United States economists surveyed at random generally disagreed with the proposition that "[a] ceiling on rents reduces the quantity and quality of housing available"); *see also Rent Control's Big Dilemma,* San Francisco Chron., Feb. 28, 1986, at 76, col. 1. The rationality of rent control *vel non* may have to be reassessed in light of this growing body of thought on the subject. *Cf. Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, ——, 106 S.Ct. 1348, 1357–59, 89 L.Ed.2d 538 (1986) (reexamining inference to be drawn in predatory pricing cases in light of recent law and economics commentary on the subject).

27. The cases appellee cites, e.g., *Agins,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106, and *Penn Central,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, stand for the proposition that the existence of residual economic value in the property defeats a taking claim where a regulatory taking is alleged. This rationale simply does not apply to cases involving a taking by physical occupation.

28. The city also argues that the Halls' claim is premature, citing *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). It is not clear what the city would have the Halls do to perfect their claim. Unlike *Williamson* and the more recent case of *MacDonald, Sommer & Frates v. Yolo County,* —— U.S. ——, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), the Halls have no further administrative recourse available; there is nothing they may do under the Santa Barbara ordinance that would exempt them from its reach or cut off the rights they claim tenants now have in their land.

*Williamson* and *MacDonald* were regulatory taking cases, not physical invasion cases. By their nature, regulatory taking cases are not ripe for constitutional adjudication until the governmental authority has had its final say, thereby defining precisely what (if anything) was taken. As the Court said in *MacDonald,* "[u]ntil a property owner has 'obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property,' 'it is impossible to tell whether the land retain[s] any reasonable beneficial use or whether [existing] expectation interest ha[ve] been destroyed.'" —— U.S. at ——, 106 S.Ct. at 2566–67 (quoting *Williamson,* 105 S.Ct. at 3118 n. 11). This, of course, is the test in regulatory taking cases, not physical invasion cases.

The inapplicability of the *Williamson/MacDonald* line of cases underscores the difference between this case and the regulatory taking cases on which the city relies so heavily. Where there has been a physical invasion, the taking occurs at once, and nothing the city can do or say after that point will change that fact.

## Conclusion

Because there has been no trial, we cannot and do not express any view as to whether the Santa Barbara ordinance constitutes a taking. We hold only that, on the facts alleged, it may, and that at this stage we are unable to resolve this fact-bound issue. In such circumstances, the motion to dismiss was improvidently granted and we remand the case to the district court for further proceedings consistent with this opinion.

Before SNEED and KOZINSKI, Circuit Judges, and SOLOMON,* District Judge.

## ORDER

The panel, as constituted above, has unanimously voted to deny the petition for rehearing and to reject the suggestion for a rehearing en banc.

The full court has been advised of the suggestion for en banc rehearing and upon the vote of the eligible judges in active service, a majority failed to vote for en banc rehearing.

The petition for rehearing is DENIED, and the suggestion for a rehearing en banc is REJECTED.

SCHROEDER, Circuit Judge, with whom NELSON and NORRIS, Circuit Judges join, dissenting from the denial of en banc hearing:

I respectfully dissent from the order denying en banc reconsideration of this case. The panel opinion holds that a city regulation controlling mobile home park rents may be a physical taking compensable under the fifth and fourteenth amendments. *Hall v. City of Santa Barbara*, 797 F.2d 1493 (9th Cir.1986). The ordinance at issue, however, is in all material respects identical to three rent regulation challenges that the Supreme Court dismissed in recent years as lacking a substantial federal question. *Fisher v. City of Berkeley*, 471 U.S. 1124, 105 S.Ct. 2653, 86 L.Ed.2d 270 (1985); *Nash v. City of Santa Monica*, 470 U.S. 1046, 105 S.Ct. 1740, 84 L.Ed.2d 807 (1985); *Fresh Pond Shopping Center, Inc. v. Callahan*, 464 U.S. 875, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983). The panel decision is thus contrary to controlling authority. The

* Judge Solomon voted on the petition for rehearing but died before this order was filed.

decision also conflicts with another circuit's opinion rejecting a similar taking challenge in light of the Supreme Court's dismissal of *Fresh Pond. Troy Ltd. v. Renna*, 727 F.2d 287, 303 (3d Cir.1984) (upholding tenancy act protecting senior citizens and disabled persons).

The panel opinion attempts to distinguish this case because, under a state statute unrelated to rent control, the tenant has the right to sell the mobile home without removing it from the park. *Hall*, 797 F.2d at 1501–02 (discussing effects of Cal.Civ. Code § 798.73 (West 1982 & Supp.1986)). Rent control makes these on-site sales attractive to buyer and seller. Santa Barbara's ordinance, however, has the same effect on the landlord as the rent ordinances in *Fisher, Nash, Fresh Pond*, and *Troy*. The landlord must allow tenants to live in mobile home parks under controlled rent so long as they do not give any cause for eviction. S.B.Ord. § 26.08.040.

The reason that the Supreme Court has had little difficulty with rent control cases is that economic regulation of landowners' profit does not constitute a taking so long as the owner is allowed a reasonable return on investment. *See, e.g., Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 1026–27, 89 L.Ed.2d 166 (1986); *United States v. Riverside Bayview Homes, Inc.*, — U.S. —, 106 S.Ct. 455, 460 n. 6, 88 L.Ed.2d 419 (1985); *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 105 S.Ct. 3108, 3119, 87 L.Ed.2d 126 (1985); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2875, 81 L.Ed.2d 815 (1984); *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980); *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124–25, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631 (1978). *See also Troy*, 727 F.2d at 300; *Kargman v. Sullivan*, 582 F.2d 131, 134 (1st Cir.1978). The Santa Barbara ordinance does not deprive landlords of a reasonable return on their investment. In fact, the ordinance mandates that park owners receive a fair investment return. S.B.Ord. § 26.08.-020(D).

The panel therefore attempts to distinguish this case from all other cases involv-

ing economic regulation of property by asserting that the claimed interference here is tantamount to a "physical invasion" of the property. *Hall,* 797 F.2d at 1498. This is, of course, the same argument the Supreme Court refused to consider in *Fresh Pond;* the *Hall* analysis is borrowed from Justice Rehnquist's lone dissent from that dismissal. 464 U.S. at 875, 104 S.Ct. at 218 (Rehnquist, J., dissenting).

The panel acknowledges that the economic regulation cases withstand even "drastic diminution in the value and usefulness" of property. *Hall,* 797 F.2d at 1497 (citing *Penn Central*). Because the Supreme Court held in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), that the extent of interference with the actual use of the property becomes irrelevant when the deprivation is physical, the panel is forced to characterize this ordinance as authorizing a "physical occupation." Its decision relies almost exclusively upon Justice Marshall's opinion in *Loretto.* That opinion therefore deserves close attention.

*Loretto* makes a sharp distinction between permanent, physical occupations, on the one hand, and regulations impairing use, or even causing temporary injury to property, on the other. The hallmark of the physical invasion described in *Loretto* is actual appropriation of the land itself through physical contact, as, for example, through flooding or direct occupancy. *Loretto* concerned the installation of cable, a "direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall." *Id.* at 438, 102 S.Ct. at 3177. Under the *Loretto* analysis, "placement of a fixed structure on land or real property is an obvious fact that will rarely be subject to dispute." *Id.* at 437, 102 S.Ct. at 3177. Once the fact of occupation is shown, compensation is required regardless of the extent of the physical occupation. *Id.* at 436–37, 102 S.Ct. 3176–77. Thus *Loretto* holds that physical invasion requires compensation for a relatively minor and almost insignificant interference with the use of property. Moreover, a taking can be found under this theory without consideration of the important public benefits achieved by the action. *Id.* at 434–35, 102 S.Ct. at 3175.

The panel's appellation of rent control as a "physical invasion," is built upon the notion that economic regulation can "shade" into physical invasion. *Hall,* 797 F.2d at 1502. This is antithetical to the reasoning of *Loretto.* In the final pages of *Loretto,* the Court expressly characterized its holding as a "very narrow" one, 419 U.S. at 441, 102 S.Ct. 3179, and distinguished the physical occupation from cases involving the government's power to regulate land—specifically, landlord-tenant relationships.

Finally, we do not agree with appellees that application of the physical occupation rule will have dire consequences for the government's power to adjust landlord-tenant relationships. This Court has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails. *See, e.g., Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964) (discrimination in places of public accommodation); *Queenside Hills Realty Co. v. Saxl,* 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096 (1946) (fire regulation); *Bowles v. Willingham,* 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944) (rent control); *Home Building & Loan Assn. v. Blaisdell,* 290 U.S. 398, 54 S.Ct. 231, 78 L.Ed. 413 (1934) (mortgage moratorium); *Edgar A. Levy Leasing Co. v. Siegel,* 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (1922) (emergency housing law); *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921) (rent control).

*Id.* at 440, 102 S.Ct. 3178. We now in this circuit face, as a result of the *Hall* opinion, the very "dire consequences" that the Court intended to avoid in *Loretto.*

In addition to all of these infirmities, the *Hall* opinion in Part II adopts a view, heretofore spurned by the Supreme Court as a tool of constitutional analysis, which may well create even broader turmoil in other fields of economic regulation. 797 F.2d at 1502–03. It endorses the proposition that the constitutionality of a regulation depends not upon a court's assessment of its legal consequences, but upon economists' assessment of its practical effectiveness. The panel suggests in a footnote, for example, that we may have to reassess the ra-

tionality of "rent control *vel non*" in light of the growing literature on the subject. *Id.* at 1503 n. 26.

The opinion acknowledges that the Santa Barbara City Council enacted the ordinance "to alleviate what it perceived as [a] 'critical shortage of low and moderate income housing.'" *Id.* at 1503. Then it assails the ordinance for failing to live up to that purpose. *Id.* "Significant doubt" as to whether a legislative body's goals are in fact achieved is not sufficient to warrant striking down an ordinance, however. Legislation passes muster if the legislature reasonably could have concluded that its action would promote a legitimate state interest. *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 2472, 86 L.Ed.2d 11 (1985). The judiciary does not have the power to sit as a "superlegislature" second-guessing the wholly economic regulations of state and local governments. *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) (per curiam).

This case is important. Although it is not a decision on the merits invalidating any ordinance, it is an authorization for broad, wholesale attacks upon rent control regulation. It casts a shadow upon all economic regulation. Our court must now sit idly by and watch taxpayers' money and court time being expended in litigation over the effects of this decision. I regret that we did not take this case en banc and put our circuit back in line with the Supreme Court and the rest of the country.