### Carol P. GIBBS

v.

### SOUTHEASTERN INVESTMENT CORP.

### Civ. No. H–86–565 (PCD).

United States District Court, D. Connecticut.

Jan. 30, 1989.

See also, 651 F.Supp. 1419.

Philip L. Steele, Richard M. Porter, Rogin, Nassau, Caplan, Lassman & Hirtle, Hartford, Conn., for plaintiff.

James T. Haviland, II, Howard, Kohn, Sprague & Fitzgerald, Hartford, Conn., Edward E. Moukawsher, New London, Conn., for defendant.

Robert M. Langer, William M. Rubenstein, John M. Looney, Stephen R. Park, Asst. Attys. Gen., Hartford, Conn., amicus curiae, for State of Conn.

## RULING ON MOTION FOR JUDGMENT N.O.V. and APPLICATION FOR PUNITIVE DAMAGES AND ATTORNEY FEES

DORSEY, District Judge.

### I. *Background*

Defendant, Southeastern Investment Corporation ("Southeastern"), owns and operates a Norwich mobile home park in which it rents lots to persons who own mobile homes. In 1983, Southeastern sold a mobile home, located on a lot in its park, to plaintiff. In April 1983, Gibbs and Southeastern entered into a rental agree-

ment for the lot occupied by Gibbs' mobile home. In May 1986, plaintiff brought this action against defendant, claiming that defendant wrongfully and/or fraudulently caused her to submit to eviction, that defendant misled her as to her rights and remedies accorded by the Connecticut Mobile Manufactured Home Parks, Owners, and Residents Act ("the Act"), Conn.Gen. Stat. §§ 21–64 to 84a; and that defendant refused to honor certain of her rights protected by the Act. On July 2, 1987, the jury found for plaintiff on seven of her ten claims that defendant's conduct violated the Connecticut Unfair Trade Practices Act ("CUTPA"),[1] Conn.Gen.Stat. §§ 42–110a to 110q, and on two of her four claims that defendant fraudulently misled plaintiff and fraudulently failed to disclose her rights under the Act.

Southeastern has moved for judgment notwithstanding the verdict on the ground that the Act, specifically §§ 21–79, 80, works an unconstitutional taking of property without just compensation. Plaintiff counters that the Act is constitutional and that, even if the challenged provisions are invalid, the validity of the verdict should not be affected.

## II. *Timeliness and Preservation of Defense*

■ Defendant first raised the defense of unconstitutionality in a motion for directed verdict at the close of plaintiff's case in chief. Thus, defendant has preserved the question of the constitutionality of the Act only insofar as it presents a defense of failure to state a claim upon which relief can be granted, which defense may be raised at any time until a disposi-

tion on the merits. Fed.R.Civ.P. 12(h)(2); Ruling on Pending Motions at 2 (November 18, 1987). In order to prevail at this stage of the litigation, defendant must show that the challenged provisions of the Act are unconstitutional on their face (i.e., void *ab initio* and without the necessity of inquiry into application to defendant's property value, etc.) and that as a result plaintiff does not state a claim for fraud or under CUTPA.

## III. *Mobile Manufactured Home Parks, Owners, and Residents Act*

The Act comprehensively regulates the operation of mobile home parks in the state. The principal sections at issue regulate (a) the eviction of residents who own mobile homes located in a mobile home park, § 21–80(b)(1); and (b) the resident's right to sell the mobile home in the mobile home park and the landlord's right to approve such sale, § 21–79. Specifically, the statute allows eviction of residents who own mobile homes only for the following reasons:

(a) Nonpayment of rent or other reasonable charges, § 21–80(b)(1)(A).

(b) Material noncompliance by the resident with statutory obligations, § 21–80(b)(1)(B).

(c) Material noncompliance by the resident with the rental agreement or park rules and regulations, § 21–80(b)(1)(C).

(d) Failure by the resident to agree to a proposed rent increase, § 21–80(b)(1)(D).

These reasons are exclusive, so that eviction may not even occur upon expiration of

---

1. The elements of a CUTPA violation include: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [(competitors or other businessmen)]. *Web Press Serv. Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355, 525 A.2d 57, *later*

appeal, 205 Conn. 479, 533 A.2d 1211 (1987), quoting *McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 568, 473 A.2d 1185 (1984), quoting *Conaway v. Prestia*, 191 Conn. 484, 492–93, 464 A.2d 847 (1983), quoting *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244–45 n. 5, 92 S.Ct. 898, 905–06 n. 5, 31 L.Ed.2d 170 (1972). "[A]ll three criteria do not need to be satisfied; a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *McLaughlin Ford*, 192 Conn. at 569 n. 15, 473 A.2d 1185.

the lease. *Liberty Mobile Home Sales, Inc. v. Peters*, 11 Conn.L.Trib. No. 18 at 18–19 (No. SPH–8401–22129, Oct. 31, 1984). Furthermore, execution of an eviction for failure to agree to a proposed rent increase is statutorily stayed for six months. § 21–80(a).

Residents must be permitted to sell their mobile homes within the park development so long as the mobile home is safe, sanitary and in conformance with the aesthetic standards of the park, § 21–79(a), but any purchaser of the on-site mobile home must assume and be bound by the seller's rental agreement and the rules and regulations of the park. *Id.* The park owner is prohibited from denying entry to a purchaser of an on-site mobile home except for good cause, with good cause defined to mean only:

> Reasonable cause for the owner to believe (1) that such purchaser intends to utilize the purchased mobile manufactured home for an illegal or immoral purpose or for any purpose that would disturb the quiet enjoyment of the other residents of the park or (2) that the purchaser is or will be financially unable to pay the rent for the space or lot upon which the purchased mobile manufactured home is located.

§ 21–79(d). Finally, the statute permits the owner to cease use of his property as a mobile home park and evict all the residents upon providing written notice one year in advance. § 21–80(b)(1)(E).[2]

## IV. *The Takings Challenge*

■ Defendant argues that the Act—specifically §§ 21–79, –80 relied on by the jury in finding for plaintiff—effects a taking of private property without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Because the act effectively creates a perpetual lease by limiting grounds for eviction, defendant claims that "the park owner is foreclosed from its fee simple ownership right to control who will occupy its property and on what terms." Defendant's Memorandum in Support at 4. In addition, defendant claims that the alleged taking is not for a public use, but rather confers a private benefit on mobile home owners at the expense of park owners.

The fifth amendment provides: "[N]or shall private property be taken for public use without just compensation." U.S. Const. Amend. V. This guarantee is "designed to bar government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Although it is clear that "land use regulation can effect a taking if it 'does not substantially advance legitimate state interests, ... or denies an owner economically viable use of his land,' " *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485, 107 S.Ct. 1232, 1242, 94 L.Ed. 2d 472 (1987), quoting *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (citations omitted), the Supreme Court

> has generally "been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." Rather, it has examined the "taking" question by engaging in essentially ad hoc, factual inquiries that have identified several factors—such as the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the government action—that have particular significance.

*Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332

---

**2.** The statute further regulates the landlord-tenant relationship by requiring, inter alia, (1) licensing of all mobile home parks, § 21–65a; (2) a written lease which clearly discloses the terms of the tenancy and the rights and obligations of the parties under the statute, § 21–70; (3) "good cause" by the owner for restricting suppliers of other commodities or services, such as milk, bakery, newspaper, laundry or other deliveries, § 21–78; (4) the inclusion of certain required provisions in every rental agreement, § 21–82; and (5) the exclusion of certain prohibited provisions in every rental agreement, § 21–83.

(1979), citing *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

## A. Character of the Government Action

The analysis in this case depends largely upon the characterization of the government action. Defendant contends that the Act effects a *per se* taking by allowing residents "a permanent physical occupation," *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982), of the park owner's land. Plaintiff counters that this case involves instead "a regulation that merely restricts the use of property." *Id.* at 430, 102 S.Ct. at 3173. In the former view, a taking necessarily must be found, while the latter view "requires a weighing of private and public interests," *Agins,* 447 U.S. at 261, 100 S.Ct. at 2141, and must be "analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity." *Loretto,* 458 U.S. at 440, 102 S.Ct. at 3178.

In *Loretto,* a New York statute required a landlord to permit the permanent installation of cable television equipment on his property by a cable company. Justice Marshall, writing for the court, found that under such circumstances no balancing of interests was to be considered; the permanent physical attachment to the property was necessarily a taking "without regard to the public interests that it may serve." *Id.* at 426, 102 S.Ct. at 3171. The minimal impact on the property was irrelevant: "Permanent occupations of land by such installations as telegraph and telephone lines, rails, and underground pipes or wires are takings even if they occupy only relatively insubstantial amounts of space and do not seriously interfere with the landowner's use of the rest of his land." *Id.* at 430, 102 S.Ct. at 3173.

The Court was careful to note, however, that its holding was "very narrow," *id.* at 441, 102 S.Ct. at 3179, and not intended to alter

> the government's power to adjust landlord-tenant relationships. This court has consistently affirmed that states have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails. *See, e.g., Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241 [85 S.Ct. 348, 13 L.Ed.2d 258] (1964) (discrimination in places of public accommodation); *Queenside Hills Realty Co. v. Saxl,* 328 U.S. 80 [66 S.Ct. 850, 90 L.Ed. 1096] (1946) (fire regulation); *Bowles v. Willingham,* 321 U.S. 503 [64 S.Ct. 641, 88 L.Ed. 892] (1944) (rent control); *Home Building & Loan Ass'n v. Blaisdell,* 290 U.S. 398 [54 S.Ct. 231, 78 L.Ed. 413] (1934) (mortgage moratorium); *Edgar A. Levy Leasing Co. v. Siegel,* 258 U.S. 242 [42 S.Ct. 289, 66 L.Ed. 595] (1922) (emergency housing law); *Block v. Hirsh,* 256 U.S. 135 [41 S.Ct. 458, 65 L.Ed. 865] (1921) (rent control).... So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity. *See Penn Central Transportation Company v. New York City,* 438 U.S. 104 [98 S.Ct. 2646, 57 L.Ed.2d 631] (1978).

*Id.* at 440, 102 S.Ct. at 3178.

Subsequently, Justice Marshall has reaffirmed the "very narrow" application of *Loretto. See FCC v. Florida Power Corp.,* 480 U.S. 245, 251, 107 S.Ct. 1107, 1111, 94 L.Ed.2d 282 (1987). Writing for a unanimous Court, he found *Loretto* inapplicable to a situation where the Federal Communications Commission had been given the authority to determine "just and reasonable" rates that utility companies could charge cable television systems for the use of utility poles to string television cable. *Id.* In determining that no taking of the utility company's property had occurred, he distinguished *Loretto* on the grounds that "the statute ... in *Loretto* specifically *required* landlords to permit permanent physical occupation of their property by cable companies, [whereas] nothing in the Pole Attachments Act ... gives cable companies any right to occupy space on utility

poles, or prohibits utility companies from refusing to enter into attachment agreements with cable operators." *Id.* That the Act merely regulated a voluntarily created landlord-tenant relationship was crucial to the analysis. "[T]he line which separates these cases from *Loretto* is the unambiguous distinction between a commercial lessee and an interloper with a government license." *Id.* at 252–53, 107 S.Ct. at 1112–13.

Notwithstanding these limitations of *Loretto*, defendant argues strenuously that *Hall v. City of Santa Barbara*, 813 F.2d 198 (9th Cir.1986), *cert. denied*, — U.S. —, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988), which adopted the *Loretto* approach, is controlling in this case. *Hall* involved an ordinance similar to the Act which required mobile home park operators to offer their tenants leases of unlimited duration, *coupled* with a rent control over-lay which strictly limited rent increases. A Ninth Circuit panel, without "express[ing] any view as to whether the Santa Barbara ordinance constitutes a taking," *id.* at 209, reversed the district court's dismissal of the case on the ground that "the allegations of the complaint seem to present a claim for taking by physical occupation, as in *Loretto, Kaiser–Aetna* and their precursors." *Id.* at 203. A second panel of judges—dissenting from the denial of en banc reconsideration of the case—sharply criticized the first panel's analysis under *Loretto* as "contrary to controlling authority." *Id.* at 209 (dissenting opinion). "The ordinance at issue ... is in all material respects identical to three rent regulation challenges that the Supreme Court dismissed in recent years as lacking a substantial federal question. *Fisher v. City of Berkeley*, 471 U.S. 1124 [105 S.Ct. 2653, 86 L.Ed.2d 270] (1985); *Nash v. City of Santa Monica*, 470 U.S. 1046 [105 S.Ct. 1740, 84 L.Ed.2d 807] (1985); *Fresh Pond Shopping Center, Inc. v. Callahan*, 464 U.S. 875 [104 S.Ct. 218, 78 L.Ed.2d 215] (1983)." *Id.*

*Hall* is not controlling authority for the instant case,[3] because (1) *Hall* never resolved the takings challenge presented, but merely upheld the plaintiffs' complaint as one which stated a claim for relief; and (2) the ordinance challenged in *Hall* provided for rent control in addition to limiting park owners' rights to evict. Accordingly, the claim in *Hall* involved more than the statutory grant of a perpetual lease; it involved "the right to a perpetual lease *at a below-market rental rate*," *id.* at 201 (emphasis added), a situation readily distinguishable from the instant case, in which no rent control provisions are involved.[4]

Given the inapplicability of *Hall* and the limited holding of *Loretto*—especially as clarified in *Florida Power*—the inescapable conclusion is that the Act does not effect a permanent physical occupation of a mobile home park owner's land. The Act does not compel a park owner to allow portions of his property to be occupied by a third party for a use to which he has not consented. The Act merely regulates a landlord-tenant relationship once the landowner has voluntarily entered into such. Thus, the Act effects physical occupation no more than did the Pole Attachments Act in *Florida Power*. "This element of required acquiescence is at the heart of the concept of occupation." *Florida Power*, 480 U.S. at 252, 107 S.Ct. at 1112. *See also*

---

**3.** The state law cases cited by defendant, although not binding on this court, also do not advance defendant's position. In *Palm Beach Mobile Homes, Inc. v. Strong*, 300 So.2d 881 (Fla.1974), the Florida Supreme Court declined to address the taking issue, and in *Kennedy v. City of Seattle*, 94 Wash.2d 376, 617 P.2d 713 (1980), the Washington Supreme Court balanced public and private interests as in non-*per se* cases. Additionally, the facts in *Kennedy* were such that a landlord was forced to rent his boat moorage space or be denied all use of it. By contrast, the Connecticut Act permits a change in use of park space after one year.

Significantly, the Connecticut Supreme Court recently upheld the Act against the same takings challenges made here, *Eamiello v. Liberty Mobile Home Sales, Inc.*, 208 Conn. 620, 546 A.2d 805 (1988), declining to follow *Hall* and concluding that the Act, on balance, is not "so onerous as to constitute a taking of private property." *Id.* at 646, 546 A.2d 805.

**4.** In fact, Connecticut's statutory scheme specifically provides for rent increases, § 21–80(b)(5), and permits eviction of residents for failure to agree to such increases, § 21–80(b)(1)(D), albeit with a six month delay of eviction, § 21–80(c).

*Troy Ltd. v. Renna*, 727 F.2d 287, 302 (3d Cir.1984) ("Finally, any doubt that *Loretto* made no change in the law with respect to holdover tenancies is confirmed by the Supreme Court's summary dismissal for want of a substantial federal question in *Fresh Pond Shopping Center, Inc. v. Acheson Callahan*, 464 U.S. 875 [104 S.Ct. 218, 78 L.Ed.2d 215] (1983)." *Fresh Pond* involved a takings challenge against a Cambridge rent control ordinance which allegedly authorized tenants to remain "indefinitely.").

The Act simply adjusts the economic benefits and burdens of the mobile home landlord-tenant relationship; by allowing eviction only for cause and permitting the on-site sale of a mobile home by a park resident, the Act preserves for the resident the economic value imparted to the mobile home by its location in a park. The Act thus represents a legislative decision to protect the park resident's financial interests in a secure tenure on the lot by preventing park owners from interfering with the quiet enjoyment or sale of the home. This type of "public program adjusting the benefits and burdens of economic life to promote the common good," *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659, must be analyzed by balancing the public and private interests involved. *See Agins*, 447 U.S. at 260–61, 100 S.Ct. at 2141.

### B. Public Interest

In order to pass constitutional muster, a regulation challenged as a taking must "substantially advance legitimate state interests." *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141, citing *Nectow v. Cambridge*, 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928). Regulation of the landlord-tenant relationship is clearly a legitimate state interest, *see, e.g., Loretto*, 458 U.S. at 440, 102 S.Ct. at 3178 (states have "broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails"), even when directed toward a distinct segment of the population. *Sadowsky v. City of New York*, 732 F.2d 312, 318 (2d Cir.1984) (law limiting ability to demolish single room occupancy buildings in New York City, specifically intended to protect the poor and elderly occupants of these buildings, had "a valid, even admirable, purpose").

The Act "serves the substantial public purpose of protecting the economic interests of mobile home tenants in selling their homes on site ... [and thereby] benefits many low income people who cannot afford to purchase more expensive housing." *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 255, 550 A.2d 1061 (1988).

### C. Private Interest

Lastly, a government regulation may constitute a taking if it "denies an owner economically viable use of his land." *Agins*, 447 U.S. at 260, 100 S.Ct. at 2141. This standard requires virtually a total denial of economic return, not just a prohibition on the most beneficial use of a parcel, *Penn Central*, 438 U.S. at 125, 98 S.Ct. at 2659 (" '[T]aking' challenges have ... been held to be without merit in a wide variety of situations when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm."). *See also Agins*, 447 U.S. at 262, 100 S.Ct. at 2142.

The Act does not deprive park owners of economically viable use of their land. Park owners receive rent for their lots as they may freely negotiate before any occupancy by a tenant and thus before any obligations or limitations accrue for the tenants' benefit. The statute permits rent increases "consistent with rents for comparable lots in the same park." § 21–80(b)(5). Residents may be evicted for failure to pay rent, § 21–80(b)(1)(A), and the park owner is free to convert the site to use other than as a mobile home park upon one year's notice to the residents. § 21–80(b)(1)(E). These provisions clearly allow a park owner a reasonable economic return on his investment. On balance then, the public interest served by the Act and reasonable return allowed a park owner are sufficiently within constitutional limits so as not to effect a taking. Accordingly, defendant's motion for Judgment N.O.V. is denied.

## V. *Punitive Damages*

■ Plaintiff has applied for punitive damages on the grounds that defendant's conduct was (a) part of a pattern or practice with respect to many of its defendants; (b) clearly fraudulent; and (c) likely to recur without the imposition of a strong deterrent.

CUTPA allows the court to award punitive damages "in its discretion." Conn. Gen.Stat. § 42–110g(a). Punitive damages have been found appropriate in this district for acts which were "blatently intentional ... long term practices rather than unique acts practiced only upon [the plaintiff]." *Bailey Employment System, Inc. v. Hahn*, 545 F.Supp. 62, 73 (D.Conn.1982), *aff'd*, 723 F.2d 895 (2d Cir.1983).

The evidence at trial and the jury's findings do not support a finding that defendant's actions were part of a pattern or practice intended to mislead or deceive numerous residents of the mobile home park; only the fraud against plaintiff was documented. Accordingly, the court declines to assess punitive damages against the defendant.

## VI. *Attorney Fees*

CUTPA allows for the awarding of costs and reasonable attorney fees to a successful plaintiff. Conn.Gen.Stat. § 42–110g(d). The purpose of such an award is to "enhance[ ] the private CUTPA remedy and serve[ ] to encourage private CUTPA litigation." *Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 617, 440 A.2d 810 (1981). Accordingly, plaintiff's application for attorney fees is granted in the amount deemed reasonable by the court, as specified below.

### A. Billing Rates

■ Plaintiff's attorney's billing rates of $95/hour in 1986 and $110/hour in 1987 are reasonable, given the attorney's experience and the market rate for such services. Similarly, the $50/hour charged for paralegal or law clerk services is reasonable.

### B. Hours Submitted

■ The detailed summation of hours spent on this case by plaintiff's attorney is,

by and large, quite reasonable. The one point of contention, noted by defendant, is the more than 27 hours spent drafting the complaint. Although the complaint is 19 pages long and relatively detailed, the court considers 20 hours a more reasonable amount of time for its completion.

■ In other areas, plaintiff's attorney spent 3.35 hours drafting interrogatories, approximately 35 hours preparing a response to the Trial Preparation Order (for a trial which lasted 30 hours), and approximately 60 hours preparing for trial. These times are subject to a question of duplication between the response to the Trial Preparation Order and the preparation for trial. A deduction of 25 hours in the time for these two undertakings is in order. The many brief meetings and phone calls documented are reasonable, given the length and complexity of this case.

Accordingly, plaintiff is awarded attorney fees and costs in the amount of $25,311.21, which represents the sum of the fees and costs documented, less the amount for the hours found to be excessive.

### C. Supplementation of Attorney Fees

Given the denial of defendant's motion for judgment n.o.v. and the award of attorney fees, plaintiff shall have until February 10, 1989, to file documentation regarding additional attorney fees incurred in connection with defendant's motion. Defendant shall have until February 17, 1989, to respond to plaintiff's filing.

## VII. *Conclusion*

For the foregoing reasons, defendant's motion for judgment n.o.v. is denied and plaintiff is awarded $25,311.21 in attorney fees and costs. Plaintiff shall file documentation of additional attorney fees on or before February 10, 1989, to which defendant shall respond by February 17, 1989.

SO ORDERED.