[No. D010307. Fourth Dist., Div. One. Oct. 31, 1990.]

JOHN K. YEE et al., Plaintiffs and Appellants, v.
CITY OF ESCONDIDO, Defendant and Respondent.

[And 11 other cases.]*

*H. N. and Frances C. Berger Foundation v. City of Escondido, No. D010769; Mountain Shadows Mobile Home Estates v. City of Escondido, No. D010805; Richard C. Kuebler dba Moonglow Mobile Home Park v. City of Escondido, No. D010942; Casa De Amigos Mobile Home Estate v. City of Escondido, No. D010972; Vista Verde Limited v. City of Escondido, No. D011011; Escondido Mobileparks West v. City of Escondido, No. D011027; Robert Dolley et al. v. City of Escondido, No. D011028; Glen Charles De Jong et al. v. City of Escondido, No. D011029; Del Dios Mobile Home Estates v. City of Escondido, No. D011030; Imperial Escondido Mobile Estates v. City of Escondido, No. D011046; and Mildred D. Tacey v. City of Escondido, No. D011115.

**COUNSEL**

Jagiello & Pech, Robert J. Jagiello and Debra K. Butler for Plaintiffs and Appellants.

David R. Chapman and Jeffrey R. Epp, City Attorneys, Donald R. Lincoln, Linda B. Reich and Endeman, Lincoln, Turek & Heater for Defendant and Respondent.

## OPINION

WIENER, Acting P. J.—Plaintiffs in these consolidated cases are all owners of mobilehome parks in Escondido. They ask us to revisit an issue of federal constitutional law we first considered several years ago in *Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside* (1984) 157 Cal.App.3d 887 [204 Cal.Rptr. 239]. In that case we rejected an argument made by an association of park owners that a rent control ordinance constituted a compensable "taking" because tenants were able to realize a premium on the sale of their mobilehomes in a rent controlled park compared with the price similar homes sold for in a nonrent control setting. Plaintiffs urge we reconsider our views relying on a more recent opinion from the Ninth Circuit Court of Appeals which, based on an admittedly lengthier analysis, accepted such an argument. (See *Hall* v. *City of Santa Barbara* (9th Cir. 1986) 833 F.2d 1270.)

While federal circuit court precedent on issues of federal law is certainly entitled to substantial deference, it is not binding. (*Rohr Aircraft Corp.* v. *County of San Diego* (1959) 51 Cal.2d 759, 764 [336 P.2d 521]; see 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 780, p. 751.) We have reviewed the issue anew in light of *Hall*. Putting aside the practical effect of our decision[1], we find *Hall*'s reasoning unpersuasive and reaffirm the conclusion we reached in *Oceanside*.

### FACTUAL AND PROCEDURAL BACKGROUND

In June 1988, voters in the City of Escondido passed an initiative measure which enacted a mobilehome rent control ordinance. Generally, the ordinance provided for a rollback of rents for mobilehome spaces to those existing on January 1, 1986. Park owners can seek adjustments in this base rent by filing an application with the city's Mobilehome Park Rental Review Board.[2]

Escondido's rent control ordinance does not exist in a vacuum. The relationship between landlords and tenants in mobilehome parks is extensively regulated by the California Mobilehome Residency Law. (Civ. Code,

---

[1] The Yees have filed a parallel action in federal court which was stayed by the district court judge pending exhaustion of all state court remedies. Assuming the California Supreme Court does not grant review, the Yees will then be able to return to federal court where the district court judge may feel compelled to follow *Hall* and grant the Yees the relief they seek. On the other hand, as we later explain (*post*, pp. 1357-1358), we think at least one United States Supreme Court decision which postdates *Hall* demonstrates that *Hall*'s analysis constitutes an interpretive misstep.

[2] The members of the Escondido City Council serve as the Mobilehome Park Rental Review Board.

§ 798 et seq.) Under its terms, a tenancy may not be terminated except for several specified reasons constituting good cause. (Civ. Code, § 798.56.) In addition, a park owner is compelled to accept as a new tenant a person who purchases a mobilehome from an existing tenant unless the new tenant does not have the financial ability to pay rent or, based on past tenancies, has demonstrated he or she will not comply with the park rules and regulations. (Civ. Code, § 798.74.)

It is the combined effect of the Escondido rent control ordinance and the California Mobilehome Residence Law which plaintiffs contend amounts to a compensable "taking" within the meaning of the Fifth Amendment to the United States Constitution and article I, section 19 of the California Constitution. They note that state law compels the park owner—except in limited circumstances—to accept the purchaser of an existing tenant's mobilehome as a new tenant. As a result, plaintiffs argue, the price of used mobilehomes in Escondido has increased dramatically since passage of the rent control ordinance due entirely to the fact that existing tenants are able to monetize the value to mobilehome owners living in a rent controlled jurisdiction. According to plaintiffs, Escondido's rent control ordinance constitutes a "taking" because it transfers this monetary interest from park owners—who would normally capture the value through increased rents—to tenants.

Plaintiffs never sought an adjustment in the base rent to be charged in the mobilehome parks they own under the terms of the Escondido ordinance. Instead, they filed this lawsuit challenging the constitutionality of the ordinance on its face and seeking compensation for the interest which they allege has been "taken." In each case, the court sustained the City's demurrer to the complaint without leave to amend and dismissed the action.

DISCUSSION

A

Mobilehomes and mobilehome park spaces are what economists refer to as complementary goods. Because they are used together, there is a direct and necessarily inverse relationship between the prices for complementary goods. For example, a decrease in the price of popcorn will cause an increase in the demand for popcorn poppers. Assuming a constant supply, this in turn will result in an increase in the price of popcorn poppers. The "complementary good" effect is basic to a free market economy. (See, e.g., Reynolds, Microeconomics: Analysis and Policy (5th ed. 1985) p. 41; McConnell, Economics: Principles, Problems, and Policies (10th ed. 1987) p. 55.)

It is thus inevitable that where government acts to reduce (or at least limit increases in) the rental prices charged for mobilehome spaces, the

price of mobilehomes will increase. This is particularly true where, as in California, other statutes generally compel a park owner to accept the purchaser of an existing tenant's mobilehome as a new tenant. This assures that the complementary good effect will be substantially limited to those mobilehomes currently occupying rent-controlled spaces.

Recognizing that "the function of government may often be to tamper with free markets, correcting their failures and aiding their victims" (*Fisher* v. *Berkeley* (1986) 475 U.S. 260, 264 [89 L.Ed.2d 206, 211, 106 S.Ct. 1045]), decisions of the United States and California Supreme Courts have established that local governments may, consistent with the police power, adopt rent control ordinances where imperfections in the unregulated market for rental housing allow landlords to charge excessive rents. (See, e.g., *Pennell* v. *San Jose* (1988) 485 U.S. 1, 11-12 [99 L.Ed.2d 1, 13-15, 108 S.Ct. 849].) The U.S. Supreme Court has repeatedly reaffirmed that rent control ordinances are not per se takings for the purposes of the Fifth Amendment's requirement of due compensation. (*Id.* at p. 12, fn. 6; *FCC* v. *Florida Power Corp.* (1987) 480 U.S. 245, 252 [94 L.Ed.2d 282, 290, 107 S.Ct. 1107]; *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419, 440 [73 L.Ed.2d 868, 885, 102 S.Ct. 3164].) The California Supreme Court has explained that rent control ordinances "are within the police power if they are reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property. However, if it is apparent from the face of the provisions that their effect will necessarily be to lower rents more than could reasonably be considered to be required for the measure's stated purpose, they are unconstitutionally confiscatory." (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001]; accord *Permian Basin Area Rate Cases* (1968) 390 U.S. 747, 769-770 [20 L.Ed.2d 312, 337-338, 88 S.Ct. 1344].)

Where the price charged for goods or services is excessively high due to monopoly or other unfair conditions, it necessarily follows that the price for complementary goods and services will be artificially low. Where a government regulation purports to reduce the excessive and unfair price to a reasonable level, the mere fact that the price for complementary goods and services rises as a result does not transmute an otherwise reasonable price regulation into a compensable "taking."[3]

This was the rationale underlying our succinct conclusions in the *Oceanside* case. In describing the plaintiffs' contention, we quoted from an amicus

---

[3] One might argue that monopolistic effects have caused the price of used mobilehomes to be artificially high and, as a result, such prices should be regulated as well. Even if this were true, however, it is an issue between mobilehome buyers and sellers. It does not suggest that governmental regulation of excessive rents has "taken" anything from landlords.

curiae brief: " '[W]here rents are reduced more than required for the purposes of the police power, an artificially reduced rent ceiling results, which constitutes a valuable interest to the existing tenant which may be sold to a buyer of the mobilehome under the requirements of State law. The combined effect of the Mobilehome Residency Law (Civ. Code, § 798 et seq.) and the Ordinance assures this result.' Thus, amicus argues, a park owner is bound to accept a selling tenant's assignment of an existing lease [citation], and a selling tenant with a favorable rent-controlled lease may be able to sell the onsite mobilehome for a higher price than can be obtained for the identical mobilehome situated in an unregulated park of identical quality where higher rents are being charged." (157 Cal.App.3d at pp. 906-907.) We then answered the contention: "The amicus' initial premise is flawed. The ordinance is structured to establish a fair base rent which reflects general market conditions and incorporates relevant pricing factors. Rents will not be 'reduced more than required for the purposes of the police power.' " (157 Cal.App.3d at p. 907.)

■ No one can dispute that Escondido's rent control ordinance, like the ordinance in *Oceanside*, effects a transfer of value from landlords to tenants. The critical question is whether such a transfer can be justified by a rational governmental purpose, i.e., are the controlled rents fair and reasonable. In *Oceanside* we were forced to deal with this important question and concluded the ordinance there was rationally based. Here, plaintiffs' complaints never allege the Escondido ordinance is irrational because it denies them fair and reasonable rents. Indeed, the owners have never attempted to obtain Escondido's approval for what they consider to be a "fair" rent. In the absence of such a contention, we assume the rents provided for by the ordinance are fair. If they are, there is no "taking." The fact that used mobilehomes in Escondido are selling for more than they have in the past is irrelevant.

### B

Instead of addressing the fundamental question, plaintiffs place principal emphasis on the Ninth Circuit's *Hall* opinion. (*Hall, supra*, 833 F.2d 1270.) *Hall* relies extensively on the United States Supreme Court's decision in *Loretto* v. *Teleprompter Manhattan CATV Corp., supra*, 458 U.S. 419. *Loretto* dealt with a New York law which required residential landlords to permit cable television companies to attach cables to their buildings. The court created an exception to the traditional multifactor balancing approach applicable to most governmental regulations which are alleged to constitute takings. The court explained that where the governmental action "is a *permanent physical occupation* of property, our cases uniformly have found a taking to the extent of the occupation, without regard to whether

the action achieves an important public benefit or has only minimal economic impact on the owner." (*Id.* at pp. 434-435 [73 L.Ed.2d at p. 882], italics added.) Characterizing this holding as "very narrow" (*id.* at p. 441 [73 L.Ed.2d at p. 886]), the court emphasized that "[s]o long as [government] regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity." (*Id.* at p. 440 [73 L.Ed.2d at p. 885].)

Implicitly conceding that the Santa Barbara mobilehome rent control ordinance would not constitute a taking under a traditional multifactor inquiry, *Hall* attempts to argue that the effect of the ordinance is to grant tenants the right to permanently occupy the landlord's property at a reduced rent. The opinion thus suggests that the allegations of plaintiffs' complaint fit within the narrow *Loretto* exception and constitute a per se taking.[4] *Hall*, however, does not discuss or even cite our prior decision in *Oceanside*. It dismisses the contrary implications of other substantial precedent by noting that "[i]n none of the cited cases has the landlord claimed that the tenant's right to possess the property at reduced rental rates was transferable to others, that it had a market value, that it was in fact traded on the open market and that tenants were reaping a monetary windfall by selling this right to others." (833 F.2d at p. 1278.)

*Hall* is an unfortunate corollary to the danger Justice Blackmun foresaw when, dissenting in *Loretto*, he lamented "the prospect of distinguishing the inevitable flow of certiorari petitions attempting to shoehorn insubstantial takings claims into [*Loretto*'s] 'set formula.'" (458 U.S. at p. 451 [73 L.Ed.2d at p. 892].)[5] If mobilehome park tenants in Santa Barbara or Escondido possess any rights to "permanently occupy" the landlord's property, those rights derive not from a rent control ordinance but from the state Mobilehome Residency Law which limits the circumstances under which a landlord may terminate a tenancy, imposing a "good cause" standard. No case we are aware of has remotely suggested that such a regulation of the

---

[4] Other than *Loretto*, *Hall* places primary reliance on Justice Rehnquist's solitary dissent to the court's dismissal in *Fresh Pond Shopping Center, Inc.* v. *Callahan* (1983) 464 U.S. 875 [78 L.Ed.2d 215, 205 S.Ct. 218] for want of a substantial federal question. *Hall* explains, "We do not interpret the *Fresh Pond* dismissal as repudiating everything said by Justice Rehnquist in his dissent." (833 F.2d at p. 1276, fn. 14.) There being no opinion of the court in the case of a dismissal, we have some difficulty understanding on what basis the *Hall* panel can distinguish those portions of dissent which can be relied upon from those which cannot.

[5] Even commentators sympathetic to *Hall*'s result have implicitly criticized its analysis, warning against "stretching doctrine to conclude that government has 'physically occupied' property . . . ." (Hirsch & Hirsch, *Legal-Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol* (1988) 35 UCLA L.Rev. 399, 466.)

landlord-tenant relationship constitutes a compensable taking within the meaning of *Loretto*.

Moreover, *Hall* fails to explain why the existing tenant's ability to "monetize" the future rent control savings and recapture it from later tenants when the mobilehome is sold is somehow critical to the takings analysis.[6] (See Manheim, *Tenant Eviction Protection and the Takings Clause* 1989 Wis. L.Rev. 925, 969, fn. 237.)[7] If an owner's property has been taken by the government, it should be of no constitutional consequence to whom the property has been given. Compare, for instance, a residential rent control ordinance which does not allow rent increases simply because the tenant vacates the rental unit. Similar ordinances have repeatedly withstood challenges alleging facial unconstitutionality. (See, e.g., *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644 [209 Cal.Rptr. 682, 693 P.2d 261], app. dism. 471 U.S. 1124 [86 L.Ed.2d 270, 105 S.Ct. 2653]; *Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1].) In such a case, the economic benefit of the ordinance is spread among all succeeding tenants. In this case, of course, plaintiffs and the *Hall* court would assert that the benefit of the ordinance is limited to those mobilehome tenants renting spaces at the time the ordinance is enacted. In both cases, however, the value "taken" from the property owner is conceptually identical.[8]

---

[6] *Pinewood Estates* v. *Barnegat Tp. Leveling Bd.* (3d Cir. 1990) 898 F.2d 347, which follows *Hall*, suffers from a similar defect.

[7] Commenting on *Hall* in light of the history of Supreme Court takings jurisprudence, Professor Manheim observes that Ninth Circuit's approach, "finding a taking of a quantifiable 'monetized' interest in a mobile home's placement value, is essentially that of Justice Holmes' repudiated model" in *Pennsylvania Coal Co.* v. *Mahon* (1922) 260 U.S. 393 [67 L.Ed. 322, 43 S.Ct. 158, 28 A.L.R. 1321]. (Manheim, *op. cit. supra*, 1989 Wis. L.Rev. at p. 968.) "Indeed," concludes Manheim citing *Penn Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 130 [57 L.Ed.2d 631, 652, 98 S.Ct. 2646], "the Court has squarely rejected Justice Holmes' model of dividing single parcels into discrete estates, favoring instead Justice Brandeis' approach of looking at a law's impact on overall property value . . . . [¶] Under the modern unitary approach, the net economic impact of the state [mobilehome residency] law, even when combined with local rent control, would be insufficient to cause a regulatory taking." (Manheim, *op. cit. supra*, at pp. 967-968, fns. omitted.)

[8] It may be that what really underlies the *Hall* result is the court's doubt that mobilehome rent control rationally furthers a legitimate governmental purpose. (See 833 F.2d at pp. 1280-1281.) This same concern has been voiced by a set of sympathetic commentators who question whether rent control does anything to alleviate the shortage of available mobilehomes or lessen the total economic burden on mobilehome park tenants. (Hirsch & Hirsch, *supra*, 35 UCLA L.Rev. at pp. 461-463.) While portions of the Supreme Court's takings jurisprudence have their origins in notions of substantive due process, *Hall*'s resurrection of a *Lochner*-type analysis (see *Lochner* v. *New York* (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539]) has been criticized as inconsistent with the modern Court's deferential view of the nexus between legitimate governmental purposes and chosen legislative means. (Manheim, *op. cit. supra*, 1989 Wis. L.Rev. at p. 938, fn. 86, 948-950; *Hall, supra*, 833 F.2d at p. 1284 (Schroeder, J. dis. from denial of rhg. en banc).)

Beyond its "monetization" argument, *Hall* merely identifies the necessary relationship between the prices charged for complementary goods and services—in this case the mobilehome and the mobilehome rental space—and uses it as facile but irrelevant justification for the conclusion that a taking has occurred. Put more simply, if the rents charged by park owners before rent control were excessive, the market price for used mobilehomes was artificially and perhaps unfairly low. (But see *ante*, fn. 3) When government acts to restore fair rents by imposing rent control, the fact that the price of used mobilehomes rises has not unreasonably "taken" anything from the landlord, let alone caused a "permanent physical occupation" of the landlord's property.[9]

Moreover, if *Loretto* were not clear enough that a rent control ordinance of the type considered in *Hall* does not constitute a per se taking, that conclusion was punctuated in *FCC* v. *Florida Power Co., supra,* 480 U.S. 245, decided six months after *Hall. Florida Power* involved a federal rent control statute limiting the amount utilities could charge cable television companies for the right to use power poles to string television cable. The court emphasized that the "element of *required acquiescence* is at the heart of the concept of occupation." (*Id.* at p. 252 [94 L.Ed.2d at p. 290], italics added.) The power company contended "it is a taking under *Loretto* for a tenant invited to lease at a rent of $7.15 to remain at the regulated rent of $1.79." (*Ibid.*) Rejecting this contention, the court responded, "[I]t is the

---

[9] *Hall* and commentators of a like view assume that the uncontrolled rent for a mobilehome space is its "fair" rental value. (See *Hall, supra,* 833 F.2d at p. 1276 [Tenants pay "only a fraction of what it is worth in rent . . . ."]; Hirsch & Hirsch, *op. cit. supra,* 35 UCLA L.Rev. at p. 427 ["[W]e assume that a pad's fair rental value is the market rental of a similar pad in a jurisdiction without rent controls."].) Such analysis begs the ultimate question for it fails to acknowledge that rent controls may be justified if quasi-monopolistic market conditions have allowed park owners to charge higher rents than would be possible if the market were perfectly competitive. (See, e.g., *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 287 [195 Cal.Rptr. 825].) Hirsch and Hirsch take issue with such a theory, arguing that mobilehome rent control ordinances generally penalize landlords "irrespective of the rental rates charged to tenants, the amount or frequency of rent increases, or the profits reaped by particular landlords." (Hirsch & Hirsch, *op. cit. supra,* 35 UCLA L.Rev. at p. 463.) Such an argument is presumably meant to suggest that not all landlords take advantage of the quasi-monopoly power they may possess.

Here, however, plaintiffs have limited themselves to a facial attack on the ordinance's constitutionality, refusing to seek individualized upward adjustments in the allowable rent as provided for in the ordinance. (See *ante*, pp. 1351-1352.) As the California Supreme Court has explained, "[W]hether rental regulations are fair or confiscatory depends ultimately on the result reached. [Citation.] That determination, of course, can only be made by analyzing a challenge to the regulation as applied . . . . [W]e will [only] declare a regulation invalid on its face 'when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties.' [Citations.]" (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d 644, 679, app. dism. 471 U.S. 1124 [86 L.Ed.2d 270, 105 S.Ct. 2653].) Certainly plaintiffs cannot now be heard to complain that the ordinance is indiscriminate in its approach.

invitation, not the rent, that makes the difference. The line which separates these cases from *Loretto* is the unambiguous distinction between a commercial lessee and an interloper with a government license."[10] (*Id*. at pp. 252-253 [94 L.Ed.2d at p. 290]; accord *Eamiello* v. *Liberty Mobile Home Sales* (1988) 208 Conn. 620 [546 A.2d 805, 818].)

The owners of mobilehome parks in Santa Barbara or Escondido are not required to acquiesce in the occupation of some or all of their property by third persons designated by the government. Nothing requires them to rent their property to mobilehome owners. If they choose to do so, however, the terms on which they may do so are regulated by state statute and local ordinance. Read in light of *Florida Power*, *Loretto* in no way suggests that the Escondido ordinance authorizes a permanent physical occupation of the landlord's property and therefore constitutes a per se taking.[11]

## C

Whether rent control is a good idea is politically debatable. (See generally, e.g., Salins, *Reflections on Rent Control and the Theory of Efficient Regulation* (1988) 54 Brooklyn L.Rev. 775.) The footnotes of the *Hall* opinion suggest an interest in contributing to that debate. (See, e.g., 833 F.2d at p. 1281, fn. 26.) While we find the topic an interesting one, it is not a discussion we are prepared to join. As we read the opinions of the United States Supreme Court and lower federal and state courts, the decision whether to use rent control as a tool to correct imperfections in the market system is a political issue for legislative bodies and not a question of constitutional law for the courts. Here, finding no persuasive reasoning to the contrary, we simply reaffirm what we assumed six years ago in *Oceanside* was accepted constitutional principle.[12]

---

[10] The Third Circuit in *Pinewood Estates* v. *Barnegat Tp. Leveling Bd.*, *supra*, 898 F.2d 347 adopted *Hall*'s reasoning but failed to discuss or even cite *Florida Power*.

[11] It is true the court in *Florida Power* reserved the issue of how *Loretto* might apply "if the FCC in a future case required utilities, over objection, to enter into, renew, or refrain from terminating pole attachment agreements." (480 U.S. at p. 252, fn. 6 [94 L.Ed.2d at p. 290].) Here, however, even the California Mobilehome Residency Law does not require mobilehome park owners to "refrain from terminating" mobilehome space leases. It simply regulates the economic relationship between the landlord and tenant, requiring that the landlord terminate the space rental only for good cause. As *Loretto* itself was careful to emphasize, such reasonable regulation of the landlord-tenant relationship has never been viewed as a per se taking. (458 U.S. at p. 440 [73 L.Ed.2d at p. 885]; see also *Florida Power*, *supra*, 480 U.S. at p. 252 [94 L.Ed.2d at p. 290].)

[12] We are sensitive to the concerns raised by the dissent that this is a pleading case. We have accepted the allegations of plaintiffs' complaints as true. Our difference with the federal courts in *Hall* and *Pinewood Estates* is not based on our respective determinations of what constitutes a disputed factual issue requiring the taking of evidence. The circuit courts con-

Disposition

Judgment affirmed.

Work, J., concurred.

**HUFFMAN, J.,** Dissenting.—This appeal is from an order sustaining a demurrer without leave to amend. As such, we are dealing only with the various pleadings and our inquiry is limited to whether, under the facts pleaded in the complaints, as supplemented by any matter that may properly be judicially noticed, the pleadings state facts sufficient to constitute causes of action for a governmental taking. (*Banerian* v. *O'Malley* (1974) 42 Cal.App.3d 604, 611 [116 Cal.Rptr. 919].) The court should not uphold the sustaining of a demurrer without leave to amend if there is a reasonable possibility that a defect in the complaints can be cured by amendment. (*Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113, 118 [113 Cal.Rptr. 102, 520 P.2d 726].)

The majority ignores the procedural posture of these cases and decides a complex issue without the benefit of evidence. It does this by characterizing the consolidated lawsuit as one challenging the constitutionality of the Escondido ordinance on its face. (Maj. opn., *ante*, p. 1352.) Yet the majority also accurately notes the plaintiffs are alleging it is the combined effect of the application of the ordinance and the state statute which amounts to a compensable "taking" within the Fifth and Fourteenth Amendments to the United States Constitution, and article I, section 19 of the California Constitution. (Maj. opn., *ante*, p. 1352.)

As the majority recognizes, facial challenges are different than challenges to the application of otherwise valid statutes and ordinances. (Maj. opn., *ante*, p. 1357, fn. 9.) Although a court may declare a regulation invalid on its face "when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties . . . " (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001]), the fairness or confiscatory nature of a facially valid regulation will ultimately depend on analyzing a challenge to the regulation as applied. (See *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 679 [209

cluded that if the *Hall* and *Pinewood* plaintiffs could prove their allegations, they would establish a cognizable takings claim. Assuming proof of the same factual predicates, we would find no taking. The issue is purely a question of law.

In addition, the question whether the Escondido ordinance is constitutional as applied is simply not before us. Plaintiffs specifically limited their argument to a claim of facial unconstitutionality. Our opinion should not be read to preclude these or other plaintiffs from challenging the ordinance as applied if the appropriate prerequisites (e.g., seeking adjustments from the rental review board) are satisfied.

Cal.Rptr. 682, 693 P.2d 261].) Such challenge generally involves the facts of each particularized case, not just the statute or ordinance in a vaccuum.

While the California Supreme Court has set forth a test for a constitutional facial attack of a rent control regulation, it has found it "premature and problematic" to do so for attacks against specific applications of such regulation. (*Fisher* v. *City of Berkeley, supra,* 37 Cal.3d at p. 681, fn. 35.) In *Fisher,* footnote 35, our Supreme Court carefully noted the requirement mentioned in *Birkenfeld* that rent controls must provide landlords a " 'just and reasonable return on their property' " was made in reference to a facial challenge to a regulation and concerned the legitimate exercise of local police power in enacting the regulation and not as a constitutional standard for the application of the regulation. (*Ibid.,* citing *Birkenfeld* v. *City of Berkeley, supra,* 17 Cal.3d at. p. 165.)

The majority appears to use this standard, however, to foreclose plaintiffs from individually challenging the operation of the Escondido ordinance in conjunction with the state statute. (Maj. opn., *ante,* pp. 1353, 1357, fn. 9.) Admittedly, the complaints as pleaded contain mixed allegations of facial challenges and challenges to the ordinance as applied. However, because there is a reasonable possibility the plaintiffs could plead causes of action challenging the application of the ordinance combined with the statute as was done in the two United States Circuit Courts of Appeals decisions, *Hall* v. *City of Santa Barbara* (9th Cir. 1986) 833 F.2d 1270 and *Pinewood Estates* v. *Barnegat Tp. Leveling Bd.* (3d Cir. 1990) 898 F.2d 347, upon which plaintiffs rely, I would allow the plaintiffs to amend their complaints.

As the majority makes clear, we are not bound to follow decisions of lower federal courts even on federal questions. However, when two circuits of the United States Courts of Appeals reach the same result to allow a plaintiff to proceed to attempt to prove a physical taking by application of an ordinance, which is inartfully alleged here, I believe this court should give great deference to those decisions.

The majority criticizes the Ninth Circuit decision in *Hall* for its failure to cite our earlier decision in *Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside* (1984) 157 Cal.App.3d 887 [204 Cal.Rptr. 239] and affirms our continued reliance on " . . . what we assumed six years ago in *Oceanside* was accepted constitutional principle." (Maj. opn., *ante,* p. 1358.) The difficulty, however, with this position is that although the *Oceanside* opinion discussed a multitude of issues having to do with the Oceanside ordinance dealing with rent control of mobilehome parks, it did not really address the issue now before us. The only discussion that remotely resembles the issue in this case is entirely contained in a few paragraphs which the

majority recites as succinctly concluding the Oceanside ordinance was fairly structured not to reduce rents more than required for the purposes of the police power. (Maj. opn., *ante*, pp. 1353-1354.) Respectfully, these paragraphs do not in any fashion analyze the issue presented here. Consequently, there is nothing in our *Oceanside* opinion which should be cited on the issue and we should perhaps forgive the Ninth Circuit Court of Appeals for its failure to do so.

The majority's principal criticism of *Hall* and *Pinewood* is that each opinion relies heavily on the United States Supreme Court decision of *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164]. Additionally, *Pinewood* is criticized for its failure to discuss the later case of *FCC* v. *Florida Power Corp.* (1987) 480 U.S. 245 [94 L.Ed.2d 282, 107 S.Ct. 1107]. I submit the majority's criticism of these two circuit court opinions is unwarranted.

*Loretto* makes clear physical occupation of private property by government action constitutes a taking to the extent of the occupation, regardless of public benefit or economic benefit to the owner. (*Loretto* v. *Teleprompter Manhattan CATV Corp.*, *supra*, 458 U.S. at pp. 434-435 [73 L.Ed.2d at p. 882].) Following *Loretto*, the courts in *Hall* and *Pinewood* allowed the plaintiffs to get past the dismissal stage and attempt to prove a physical taking within the meaning of *Loretto*. Each held a physical taking was *conceptually possible* under the theory raised by the pleadings of those plaintiffs.

Moreover, as the majority concedes in a footnote after its discussion of how *Florida Power* conclusively "punctuates" that the type of rent control ordinance considered in *Hall* does not constitute a taking per se, the Supreme Court in *Florida Power* did not even consider the issue of the cable television/utility rates there under its holding in *Loretto*. (Maj. opn., *ante*, p. 1358, fn. 11.) Thus, the precise issue before this court was not reached. (See *FCC* v. *Florida Power Corp.*, *supra*, 480 U.S. 245, 251-252 [94 L.Ed.2d at p. 290].) The majority's reliance on *Florida Power* to undercut *Loretto* and in turn the premise of both *Pinewood* and *Hall* is therefore inapposite.

The majority's further attempt to brush this fact aside is not persausive. As the court in *Hall* noted, the fact a tenant's right to occupy a space is not truly perpetual does not defeat a claim for taking. (*Hall* v. *City of Santa Barbara*, *supra*, 833 F.2d at p. 1277.) If a property owner is required to allow tenancy in perpetuity at compensation below market rates unless the space rental is terminated for good cause defined by the ordinance and state statute combined in application, *Loretto* indicates a taking has been shown. I would thus follow the Courts of Appeals in *Hall* and *Pinewood* in allowing the plaintiffs to proceed with their cases on this issue.

The majority opinion, although scholarly and well written, draws upon the author's own knowledge and that of text writers and law review commentators for the truth of economic principles. Popcorn and popcorn poppers may be complementary goods; however, analogy to their economic relationship does not assist us in resolving the complex questions of real property economics presented by these pleadings. Thus, I am uncomfortable with attempting to resolve those issues at this time.

I strongly believe we should allow the parties to amend their complaints so they can put on their respective cases and we can review this important and difficult issue on a full record. I therefore dissent.

Appellants' petition for review by the Supreme Court was denied January 24, 1991. Baxter, J., did not participate therein. Lucas, C. J., and Panelli, J., were of the opinion that the petition should be granted.