[No. H006972. Sixth Dist. May 10, 1991.]

ROBERT CASELLA et al., Plaintiffs and Appellants, v.
CITY OF MORGAN HILL, Defendant and Respondent.

## COUNSEL

Jagiello & Pech and Debra K. Butler for Plaintiffs and Appellants.

Marc G. Hynes, City Attorney, and Emily Cote, Assistant City Attorney, for Defendant and Respondent.

## OPINION

ELIA, J.—Appellants, owners of a mobilehome park, challenge a City of Morgan Hill mobilehome rent control ordinance, claiming that its lack of a "vacancy decontrol" provision, which allows rents to be returned to market levels when a tenant leaves, effected a taking of their property without just compensation. We conclude that the pleadings here state facts insufficient to constitute a taking, and join the other California appellate district which has rejected the contrary result espoused by the Ninth Circuit Court of Appeals in *Hall* v. *City of Santa Barbara* (9th Cir. 1986) 833 F.2d 1270, certiorari denied (1988) 485 U.S. 940 [99 L.Ed.2d 281, 108 S.Ct. 1120]. In consequence, we affirm the trial court's dismissal order.

## BACKGROUND

Appellants Robert Casella et al. are general partners who own Hacienda Valley Mobile Home Estates, a mobilehome park. Respondent City of Morgan Hill (city) first enacted a mobilehome rent stabilization ordinance in March 1983.[1] This ordinance generally regulated rental increases and included a "vacancy control" provision, which limited mobilehome park owners to increased space rents of no more than 75 percent of the consumer price index (CPI) or 8 percent, whichever was less, when a mobilehome changed ownership but stayed in the park.

This ordinance was amended in 1986 to allow no rental increase, but a one-time $25 administrative fee charge when such a change of ownership occurred. It is this inability to raise rents at the time ownership is transferred to market levels which was the basis of this lawsuit. The ordinance was amended again, effective October 4, 1989, to provide for "vacancy decontrol"; it excepted from the ordinance's restrictions increases on rents during a 30-day period commencing on a transfer of ownership of a mobile-home coach (coach) within the park.

Appellants filed a complaint against the city on August 30, 1989. The complaint stated causes of action for declaratory relief and inverse condemnation and prayed in addition for an injunction and damages.

---

[1] The "Findings and Purpose" section of this ordinance states: "Mobile home owners, unlike apartment tenants or residents of other rental stock, are in the unique position of having made a substantial investment in a residence for which space is rented or leased. Removal and/or relocation of a mobile home from a park space is not a practical alternative to accepting an excessive rent increase in that it can only be accomplished at substantial cost, and in many instances may cause extensive damage to the mobile home and loss of appurtenances such as integrated landscaping and supporting structures inconsistent with the new location. Because mobile homes are often owned by senior citizens, persons on fixed incomes, and persons of low and moderate income, exorbitant rent increases fall upon these individuals with particular harshness. (Section IV-12-1.01.) [¶] The City has sponsored extensive negotiations to eliminate the need for this ordinance. Only one of the City's mobile home parks achieved a mediated solution as a result of this delay. The remaining parks were unable to reach agreement after extensive negotiation; thus, necessitating this ordinance. (Section IV-12-1.02.) [¶] Since approximately July, 1981, a heightened pattern of excessive rent increases has emerged within some of the mobile home parks in Morgan Hill in disregard of the purposes and intent of the city's previous ordinances. Incorporation of these unduly excessive prior increases within the rate structure of this ordinance without provisions for their review would materially defeat the purpose and intent of this Ordinance and the stability it seeks to bring about. (Section IV-12-1.03.) [¶] The City Council of Morgan Hill declares that it is necessary in the public interest to establish a means by which to resolve the potentially divisive and harmful impasse between park owners and coach owners. After consideration of numerous factors, among which are the relatively small number of parks located within the City of Morgan Hill, the level of organization and communication between the mobile home owners in each park, and the mandates of State Law, regulations which best fit the needs of this City have been selected." (§ IV-12-1.04.)

The complaint alleged that the city's ordinance "has the effect of keeping rents below market rentals otherwise obtainable by plaintiff upon turnover of any given unit in plaintiff's park," that this resulted in "enabling the tenants to monetize the rent savings upon the sale of their mobile homes to third parties, and thus constitutes an impermissible transfer of wealth by the defendant to the departing tenants" in violation of the California Constitution. It alleged that the statute did not serve the "legitimate governmental purpose of preserving low [income] or affordable housing" because "it enables the tenant in place to sell the mobile home for a 'premium' due to the existence of rent control, and thus dramatically increases the mobile home price resulting in forever burdening the space with the need to pay the additional premium, or to finance the additional premium . . . ."

The complaint further alleged that the ordinance constituted a taking of appellants' right to enter into a long-term lease with incoming tenants since "[b]ut for the [o]rdinance" such a lease would be for "the consideration which the departing tenant, by virtue of the [o]rdinance, is now able to receive in a disguised form by receiving a 'premium' for the price of the coach which the departing tenant sells." As a consequence, the complaint alleged, "the [o]rdinance has effected the total transfer of all of the appreciated value of the pad from the landlord to the tenant, which the tenant realizes at the time of sale of a coach."

The city filed a demurrer to this complaint on October 17, 1989. The demurrer alleged that appellants had failed to state facts sufficient to state a cause of action, and that the same causes of action were the subject of another lawsuit between the parties.

As to the latter allegation, the facts as stated in the city's brief are that an action was filed against the city on March 19, 1984, by Allan Roman et al. The plaintiffs in that suit are the same general partners in Hacienda Valley Mobile Home Estates as are those in the present suit. The Roman suit, like this one, challenged the city's rent stabilization ordinance, specifically the vacancy control provision. It also alleged, inter alia, an unconstitutional taking of property without just compensation. The city moved for summary judgment or alternatively for summary adjudication of the issues. The trial court ruled in November 1984 that the ordinance did not constitute a taking on its face. This order was never memorialized in writing, however, and the case was not pursued by the plaintiffs. Now, although the five-year statute has run, the suit has neither been dismissed nor prosecuted and is still pending.

In the present suit, the trial court sustained the city's demurrer and dismissed the complaint on appellants' election not to amend. This appeal ensued.

DISCUSSION

■ When reviewing a dismissal based on a demurrer, an appellate court will review the facts alleged in the complaint in light of the well-established principle that "allegations of the complaint which are not contrary to law or to a fact of which this court may take judicial notice must be deemed to be true. (*Dale* v. *City of Mountain View* (1976) 55 Cal.App.3d 101, 105 . . . .)" (*Terminals Equipment Co.* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 234, 238 [270 Cal.Rptr. 329].) " 'A demurrer admits all material and issuable facts properly pleaded. [Citations.] However, it does not admit contentions, deductions or conclusions of fact or law alleged therein. [Citations.]' (*Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 . . . ; see also *White* v. *Davis* (1975) 13 Cal.3d 757, 765 . . . .) Thus, while allegations of the complaint are deemed to be true in ruling on a demurrer, 'where an allegation is contrary to law or to a fact of which a court may take judicial notice, it is to be treated as a nullity [citation].' (*Dale* v. *City of Mountain View, supra,* 55 Cal.App.3d at p. 105.) [¶] ■ Where the trial court sustains a demurrer with leave to amend but the plaintiff elects not to amend, there is a presumption that the plaintiff has stated as strong a case as he or she can. In such instances, in determining whether the trial court has abused its discretion, the appellate court must resolve all ambiguities and uncertainties raised by the demurrer against the plaintiff; 'if the complaint is objectionable on any ground raised by the demurrer, the judgment of dismissal must be affirmed. [Citations.]' (*Hooper* v. *Deukmejian* (1981) 122 Cal.App.3d 987, 994 . . . .)" (*Terminals Equipment Co.* v. *City and County of San Francisco, supra,* 221 Cal.App.3d at pp. 241-242.) With this standard of review in mind, we turn to the merits of appellants' claims.

## I.  *Previous Action*

As a preliminary, the city contends that the trial court properly sustained its demurrer on the ground that the previously mentioned *Roman* suit was pending. In essence, they contend the *Roman* suit, which also sounds in inverse condemnation, precludes the present challenge and appellants are estopped from challenging the ordinance on this ground.

■ Witkin states the rule as follows: "A second action between the same parties on *a different cause of action* is not precluded by a former judgment. . . . But the first judgment 'operates as an *estoppel* or *conclusive adjudication* as to such issues in the second action as were *actually litigated and determined in the first action.*' " (7 Witkin, Cal. Procedure (3d ed. 1985) Judgments, § 253, p. 691; *McClain* v. *Rush* (1989) 216 Cal.App.3d 18, 28-29 [264 Cal.Rptr. 563].)

The city has alleged that the trial court ruled in its favor on a facial challenge to the ordinance. It concedes this ruling was never memorialized in writing, however. Since the trial court's adjudication was interlocutory and nonappealable, it has no res judicata effect and does not constitute an estoppel. (See *De La Pena* v. *Wolfe* (1986) 177 Cal.App.3d 481, 485 [223 Cal.Rptr. 325]; 7 Witkin, Cal. Procedure, Judgments, *supra*, § 188, at pp. 621-622, & § 219, at pp. 655-656.)

II.  *Does the Morgan Hill Rent Control Ordinance Constitute a Taking?*

The protection of private property rights is guaranteed by the Fifth Amendment to the United States Constitution: "No person shall be . . . deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation." The Fifth Amendment is made applicable to the states by the due process clause of the Fourteenth Amendment. (*Chicago, Burlington etc. R'd* v. *Chicago* (1897) 166 U.S. 226, 239 [41 L.Ed. 979, 985, 17 S.Ct. 581].) Article I, section 19 of the California Constitution similarly provides that compensation is required when property is "taken or damaged."

█ Appellants claim that the effect of the Morgan Hill mobilehome rent control ordinance is to create the right to secure tenure at reduced rents. This right, they allege, has a value, and this value is transferred to the mobile-home owners (their tenants) who can then sell their mobilehomes at a premium. Appellants claim this interest—in occupying a park space at reduced rent—is an attribute of property, and that the challanged ordinance transfers this "property right" to the park tenants. This "appropriation" of appellants' property interests, they claim, constitutes an unconstitutional taking.

In *Hall* v. *City of Santa Barbara*, the Ninth Circuit Court of Appeals considered the constitutionality of a mobilehome rent control ordinance similar to that in this case.[2] Reduced to its essentials, *Hall* held that the plaintiffs had made allegations in their complaint sufficient to constitute a claim for a taking by physical occupation, as in *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164]. In *Loretto*, the United States Supreme Court held that a New York law which made it mandatory for landlords to permit a cable television company to install its facilities on their property—a "minor but permanent physical occupation"—constituted a compensable taking under the just compensation clause. (*Id.* at pp. 421, 441 [73 L.Ed.2d at pp. 873, 886].) Relying on *Loretto*,

---

[2]We are aware of the fact that the Santa Barbara ordinance at issue in *Hall* required park owners to offer their tenants leases of unlimited duration, and that no such requirement exists in the Morgan Hill ordinance at issue here.

*Hall* held that the Santa Barbara mobilehome rent control ordinance at issue transferred to mobilehome park tenants a possessory interest in the park owners' land. It concluded that plaintiffs had made out a case for compensation under the takings clause and reversed the district court's dismissal order.

Tracking *Hall*'s analysis, appellants here contend that the Morgan Hill mobilehome rent control ordinance, in combination with the state's Mobile Home Residency Law (Civ. Code, § 798 et seq.) effected a transfer of wealth from landlord to tenant, tantamount to a physical taking of property. We therefore proceed to examine the Ninth Circuit's holding in *Hall*.

The court began by noting a distinction between those United States Supreme Court cases which had found regulatory takings and those which had found a physical occupation of property. "[D]ramatically different results," *Hall* notes, depend on which type of taking a court concludes has occurred. (*Hall v. City of Santa Barbara, supra*, 833 F.2d at p. 1275.) Whereas a regulatory taking may be justified if it substantially advances legitimate state interests, a permanent physical occupation is a taking without regard to other factors. (*Id.* at pp. 1274-1275.)

The *Hall* court then concluded that the plaintiffs' allegations "seem to present a claim for taking by physical occupation . . . that the Santa Barbara ordinance has transferred [to the tenants] a possessory interest in their land"—the right to "occupy the property in perpetuity while paying only a fraction of what it is worth in rent"—and that this interest is "transferable, has an established market and a market value . . . . [¶] The right to occupy property in perpetuity is surely the type of interest that is protected by the taking clause." (833 F.2d at p. 1276.)

For this latter assertion, *Hall* cites Professor Michelman's opinion, in his seminal article *Property, Utility and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law* (1967) 80 Harv. L. Rev. 1165, 1184, that the one "incontestable case for compensation (short of formal expropriation) seems to occur when the government deliberately brings it about that its agents, or the public at large, 'regularly' use, or 'permanently' occupy, a space or a thing which theretofore was understood to be under private ownership."

We suggest that the Ninth Circuit has taken Professor Michelman's example out of context. His point was that the physical invasion test, like the diminution in value test, the magnitude of harm test, and other convenient court-made labels on governmental action, has failed to provide a

meaningful distinction between those situations in which compensation has been required and those in which it has not.[3]

Professor Michelman goes on to identify the physical invasion test as follows: "Probably it can be said that only those trespassory acts which are implicitly assertive of ownership—in the sense necessary to ground an action of ejectment or to start running the statutory period for acquisition of title by adverse possession—amount to such physical invasions as automatically, without further inquiry, require a compensation payment." (Michelman, *supra*, 80 Harv. L. Rev. at p. 1229, fn. 110.)

It is apparent to us that the Ninth Circuit's analysis in *Hall* —that the effect occasioned by the combination of the state regulations and the local ordinance was a "physical invasion"—was no more than a convenient means, as Professor Michelman suggested, of distinguishing a loss the court considered "clearly compensable" from one which it did not. (Michelman, *supra*, 80 Harv. L. Rev. at p. 1228.) To indulge in this shorthand, however, does not explain why compensation must be paid for this regulation, as opposed to other regulations which effect a redistribution of wealth for the general social good.

Professor Manheim has criticized the *Loretto* physical occupation test utilized by *Hall* as follows: "While perhaps logically appealing, the distinction drawn in *Loretto* between temporary and permanent interferences with possessory interests has two defects. It is too drastic and it is unworkable . . . . Although permanent occupations are more serious intrusions than temporary invasions, the Court's bright line distinction places too much emphasis on the duration factor, which is not always easily determined at the point when review is undertaken. It seems the Court has replaced Justice Holmes' 'too far' doctrine [*Penna. Coal Co.* v. *Mahon* (1922) 260 U.S. 393, 415 (67 L.Ed. 322, 326, 43 S.Ct. 158, 28 A.L.R. 1321)] with an equally problematic one: 'too long.' In the Court's usage, permanency assumes 'metaphysical' contours and serves as a 'talisman' in the determination of whether 'fairness and justice' preclude imposing a burden on the property owner." (Manheim, *Tenant Eviction Protection and the Takings Clause*, 1989 Wis. L. Rev. 925, 989-990, fns. omitted.)

Other commentators have criticized the physical occupation/regulatory taking dichotomy itself: "[T]here is in fact no practical difference between

---

[3]Professor Michelman concludes that "the only 'test' for compensability which is 'correct' in the sense of being directly responsive to society's purpose in engaging in a compensation practice is the test of fairness: is it fair to effectuate this social measure without granting this claim to compensation for private loss thereby inflicted?" (Michelman, *supra*, 80 Harv. L. Rev. at pp. 1171-1172.)

physically seizing property and preventing its owner from using it. . . . *Moreover, forcing someone to do things with his property—telling him 'you can keep it but you can't use it'—is indistinguishable, in ordinary terms, from grabbing it and handing it over to someone else.* Thus, a 'taking' occurs in this ordinary sense when government controls a person's use of property so tightly that, although some uses remain in the owner, the property's value has been virtually destroyed." (Tribe, American Constitutional Law (1978) p. 460 [footnotes omitted, italics in original], quoted in Berger & Kanner, *Thoughts on the White River Junction Manifesto: A Reply to the "Gang of Five's" Views on Just Compensation for Regulatory Taking of Property,* (1986) 19 Loyola L.A. L.Rev. 685, 687, fn. 10.)

Although aware of this criticism, the Ninth Circuit felt "bound to respect the distinction as drawn by the Supreme Court." (*Hall* v. *City of Santa Barbara, supra,* 833 F.2d at p. 1275, fn. 13.) Even respecting this distinction, we reject *Hall*'s espousal of the notion that economic regulation such as the rent control measure challenged here could metamorphose into the type of physical occupation described in *Loretto*. We are cognizant of Professor Manheim's caution that "[c]ourts should be wary of construing the . . .'permanent physical occupation' language of *Loretto* literally. . . . *Loretto*'s per se rule has already been narrowed, and ought to be further limited." (Manheim, *supra,* 1989 Wis. L. Rev. at p. 1012, fns. omitted.) Manheim, along with other commentators, suggests that what is required under both physical occupation and regulatory takings analyses is a "realistic appraisal of the law's actual impact on the property owner." (*Id.* at p. 940.)

We find *Hall* distinguishable in a way we think the Supreme Court would find material. (833 F.2d at p. 278.) Like the California appellate district which has considered the issue before us (see *Yee* v. *City of Escondido* (1990) 224 Cal.App.3d 1349 [274 Cal.Rptr. 551]), we repudiate *Hall*'s attempt to bootstrap a mobilehome rent control ordinance—an economic regulation—to the Supreme Court's "very narrow" holding in *Loretto*. (458 U.S. at p. 441 [73 L.Ed.2d at p. 886]; *Yee* v. *City of Escondido, supra,* 224 Cal.App.3d at p. 1355; see also Hirsch & Hirsch, *Legal-Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol* (1988) 35 UCLA L.Rev. 399, 466.) *Loretto* upheld the "traditional rule" distinguishing physical occupation cases—which are takings per se—from regulatory takings, in which a court must analyze whether "the action achieves an important public benefit or has only minimal economic impact on the owner." (458 U.S. at pp. 434-435 [73 L.Ed.2d at p. 882].) This rule, observed the court, "also avoids difficult line-drawing problems" and problems of proof (*Id.* at pp. 436-437 [73 L.Ed.2d at p. 883].)

The complaint in *Hall* alleged that the price of mobilehomes in the plaintiffs' park rose dramatically after the enactment of rent control. Plaintiffs claimed that "the substantial premium paid for mobile homes in parks subject to the Santa Barbara Ordinance reflects the transfer of a valuable property right to occupy mobile home parks at below-market rates." (*Hall* v. *City of Santa Barbara, supra*, 833 F.2d at p. 1274.) *Hall* agreed, finding "crucial" to its analysis the claim that the mobilehome park tenants were able to "derive an economic benefit from the statutory leasehold by capturing a rent control premium" (*id.* at p. 1276) when they sold their mobilehomes and that the tenants' right to possess the park owners' property at reduced rates was "transferable to others, that it had a market value, that it was in fact traded on the open market and that tenants were reaping a monetary windfall by selling this right to others." (*Id.* at p. 1278.) *Hall* concluded from this that the ordinance "changes the fundamental relationship between the parties, giving landlord and tenant complementary estates in the same land. On the one hand, the landlord loses forever a fundamental aspect of fee simple ownership: the right to control who will occupy his property and on what terms. On the other hand, the tenant gets an interest that he can liquidate and take with him . . . ." (*Id.* at p. 1279.)

What *Hall* found crucial, we regard as a truism; an inevitable part of the unique relationship between a mobilehome park owner and his or her tenant. The park owner has an equity interest in the park land; the tenant in his or her coach. (Cf. Hirsch & Hirsch, *supra*, 35 UCLA L.Rev. at p. 405: "renters of mobile home parks own the most costly part of their housing, which they have voluntarily placed on the property of another party;" the authors refer to this as "divided ownership." (*Id.* at p. 419.)

It is undisputed that economic controls on the mobilehome housing market allow tenant mobilehome owners to reap an economic benefit as a result of rent control. That such regulations have this effect does not answer the question whether they constitute a taking, however. Professor Manheim has suggested the premise underlying *Hall*'s conclusion—that the "economic fruits of enhanced site value [are] naturally the property of the park owner" (Manheim, *supra*, 1989 Wis. L. Rev. at p. 966)—is itself subject to question. (cf. *id.* at p. 966, fn. 225 [the question is rather whether the concept of property includes the right to charge "quasi-rent"; the amount attributable to space scarcity and moving costs].) The author notes also that "[i]n an economic sense, vacant spaces carry a substantial premium which would be capitalized into the value of the mobile home itself . . . . [¶] [M]obile home rent control . . . enhances the premium value associated with park space since the new owner can be assured of stable (and below market) housing costs. . . . [W]ithout rent control, a park owner could raise rents so high as to recapture any added value in the mobile home created by scarcity of sites.

In a free market, the park owner would do just that . . . . The mobile home buyer . . . would be willing to pay less for the mobile home by an amount equivalent to the space's separate value." (*Id.* at p. 956, fn. 179.)

Like others, we question *Hall*'s failure to explain why a tenant's ability to reap an economic benefit from rent control is crucial to a resolution of the constitutional question. As Justice Weiner points out in *Yee*, mobilehome rent control, which arguably benefits only the tenant in place at the time it is enacted, does not differ conceptually from other rent control, which benefits all succeeding tenants equally: "If an owner's property has been taken by the government, it should be of no constitutional consequence to whom the property has been given. . . . In both cases . . . the value 'taken' from the property owner is conceptually identical." (*Yee* v. *City of Escondido, supra*, 224 Cal.App.3d at p. 1356, fn. omitted.) Professor Manheim suggests, also, that "courts ought to focus on the property owner's loss rather than the occupier's gain." (Manheim, *supra*, 1989 Wis. L. Rev. at p. 1012 [fn. omitted]; see also Note, *Are Landlords Being Taken by the Good Cause Eviction Requirement?* (1988) 62 So.Cal.L.Rev. 321, 350 [The focus in determining whether a taking has occurred in the rent control context should "not be on what the tenant gains, but rather on what the property owner loses . . . ."].)

As *Yee* and others have pointed out, the increase in the sales prices of mobilehomes resulting from rent control may simply reflect the artificially low price caused by excessive rents charged prior to its enactment.[4] The mere fact that increased coach prices are a corollary to rent control does not establish that a taking has occurred, however. (Cf. *Yee* v. *City of Escondido, supra*, 224 Cal.App.3d at p. 1357.)

The Connecticut Supreme Court in *Eamiello* v. *Liberty Mobile Home Sales* (1988) 208 Conn. 620 [546 A.2d 805], examined a similar constitutional challenge in a fashion we find persuasive. The plaintiffs in that case, mobilehome owners and park tenants, challenged the Connecticut statute which guaranteed a mobilehome owner the right to sell on-site any

---

[4]As Professor Berger points out, "[t]he burden may seem somewhat harsher for those who are owners when rent regulation is first installed, but the usual prelude to governmental control of rents or condominium conversions is a housing shortage which allows landlords to charge high economic rents or enter the sales market. To be thwarted from exploiting a housing shortage may disappoint such owners, but commercial frustration, in the circumstances, hardly seems unjust." (Berger, *Home is Where the Heart is: A Brief Reply to Professor Epstein* (1989) 54 Brooklyn L. Rev. 1239, 1246.) Professor Berger also disputes Professor Epstein's contention (see Epstein, *Rent Control and the Theory of Efficient Regulation*, 54 Brooklyn L. Rev. (1988) 741, 756) that regulation causes rental shortages, citing the lack of empirical evidence on this score. (Berger, *supra*, 54 Brooklyn L. Rev. at pp. 1246-1247.)

mobilehome which was " 'safe, sanitary and in conformance with aesthetic standards.' " (*Id.* at p. 815). Respondents, mobilehome park owners, presented evidence of economic harm, like those advanced by appellants here, in that "the tenant who sells his mobile home on-site receives a greater price for his home than it would otherwise bring because of the right to continued occupancy of the site that is also transferable to the purchaser." (*Id.* at p. 820.)

The Connecticut Supreme Court squarely rejected this argument: "Because of the scarcity of mobile home sites, resulting largely from zoning ordinances that bar the establishment of new mobile home developments, the legislature could reasonably have concluded that a substantial portion of the price paid for a mobile home purchased on-site is attributable to the continuing right to lease the site that accompanies the sale. If the mobile home park operator could require the site to be vacated, he, rather than the tenant, would be in the position to demand for a mobile home that he had placed on the site a price greater than the home itself would bring because of the right to continued occupancy that is incident to the sale. In choosing the tenant rather than the mobile home park operator as the recipient of this economic advantage arising from the near-monopoly status of the industry, the legislature, by allocating its benefit to those who generally are more in need, has not violated any constitutional principle. In our view, [the statute] strikes a reasonably fair balance between the economic interests of mobile home tenants and those of mobile home park operators." (546 A.2d at p. 820.)

Professor Manheim points out that the *Eamiello* result is more consistent than the *Hall* result with California property law, which considers leasehold value the property of the tenant, not the landlord. (Manheim, *supra*, 1989 Wis. L. Rev. at p. 966, fn. 225, citing 4 Miller & Starr, Current Law of Cal. Real Estate § 27:92 (1977 & Supp. 1984); *Kendall* v. *Ernest Pestana, Inc.* (1988) 40 Cal.3d 488 [220 Cal.Rptr. 818, 709 P.2d 837].)

Even so vociferous a critic of rent control per se as Professor Epstein has rejected both the distinctions invoked by the Ninth Circuit to invalidate the ordinance in *Hall*; the "now standard, if largely unintelligible," Supreme Court distinction between physical and regulatory takings, and the fact that the ordinance "allowed the tenant to transfer unconditionally his leasehold, in contrast to the normal rent control statute that denies the tenant such free alienability." "Neither distinction," concludes Professor Epstein,

"passes muster, but both illustrate the rickety nature of the present doctrinal structure." (Epstein, *supra*, 54 Brooklyn L. Rev. at p. 756.)[5]

Appellants also suggest we should apply the stricter scrutiny outlined by the Supreme Court to test the government action at issue in *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141]. In *Nollan*, property owners challenged the commission's ability to condition a permit to rebuild their beachfront house on their transfer of a public easement across their property. (*Id.* at p. 827 [97 L.Ed.2d at p. 683].) In reviewing their claim, the court reiterated the rule that land-use regulation does not effect a taking if it " 'substantially advance[s] legitimate state interests' and does not 'den[y] an owner economically viable use of his land,' *Agins* v. *Tiburon*, 447 U.S. 255, 260 (1980)." (*Id.* at p. 834 [97 L.Ed.2d at p. 687].) In reviewing the connection between the regulation and the state interest, however, the court determined that the "essential nexus" (*id.* at p. 837 [97 L.Ed.2d at p. 689]) between the permit condition and the governmental purpose was lacking in that case.

This is what *Hall* questions; the relationship between the stated purpose of the Santa Barbara rent control ordinance, "to alleviate . . . 'a critical shortage of low and moderate income housing' " and its result, concluding that this issue should be addressed on remand. (833 F.2d at pp. 1280-1281.)

California courts have upheld controls in the landlord-tenant arena as legitimate exercises of the police power, if they are "reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property." (*Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001].) And we discern nothing in the decisions of the United States Supreme Court which necessitates our heightened scrutiny of the city's legislative decision to "use rent control as a tool to correct imperfections in the market system." (*Yee* v. *City of Escondido, supra*, 224 Cal.App.3d at p. 1358.) In *Pennell* v. *City of San Jose* (1988) 485 U.S. 1 [99 L.Ed.2d 1, 108 S.Ct. 849], the Supreme Court, addressing a challenge to San Jose's rent and eviction law, reiterated that " '[s]tates have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails.' " (*Id.* at p. 12, fn. 6 [99 L.Ed.2d at p. 14], quoting *Loretto* v. *Teleprompter Manhattan CATV Corp., supra*, 458 U.S. at p. 440 [73 L.Ed.2d at p. 885]; see also *FCC* v. *Florida Power Corp.* (1987) 480 U.S. 245, 252 [94 L.Ed.2d 282, 290, 107 S.Ct. 1107].)

---

[5]Professor Epstein concludes that "*Hall* reaches the right result, but only because all rent control statutes are unconstitutional, not because this statute is any worse than others." (*Id.* at p. 758.)

Professor Manheim reads the Supreme Court's *Pennell* decision as indicating that the *Nollan* strict scrutiny approach will likely be limited to "'unconstitutional conditions' and, perhaps, possessory takings cases." He concludes that Justice Rehnquist's rejection of heightened scrutiny of the San Jose law "suggest[s], for the moment at least, deferential review of most economic regulation." (Manheim, *supra*, 1989 Wis. L. Rev. at pp. 948-950.) He also points out that "[a]s *Nollan* shows, heightened scrutiny could yield any result depending, as it usually does, on the predilections of individual judges. For instance, some courts have adopted an economic efficiency model in analyzing takings cases. . . . [¶] *Hall* exhibits similar distrust of majority rule, suggesting that those supposedly benefiting from legislation do not understand their own best interests. Strict scrutiny of the means-end nexus reveals judicial disagreement with underlying economic policy, in essence requiring the legislature to prove that its scheme works. However, debates about economic theory belong in journals and legislative chambers, not in the courts." (*Ibid.*)

We agree, as did the *Hall* dissenters. They stated that "'[s]ignificant doubt' as to whether a legislative body's goals are in fact achieved is not sufficient to warrant striking down an ordinance[] . . . Legislation passes muster if the legislature reasonably could have concluded that its action would promote a legitimate state interest. The judiciary does not have the power to sit as a 'superlegislature' second-guessing the wholly economic regulations of state and local governments." (833 F.2d at p. 1284 [citations omitted], Schroder, J. dissenting from the denial of en banc hearing.) (See also Keating, *Commentary on Rent Control and the Theory of Efficient Regulation* (1989) 54 Brooklyn L. Rev. 1223, 1230 ["The political rather than the judicial forum is the proper place for this debate over economic regulatory policy."].)

The stated purpose of the city's ordinance is to control excessive rental prices for the largely fixed-income residents of mobilehome parks. This is unquestionably a legitimate state interest. The City of Morgan Hill could reasonably have concluded that the mobilehome rent control ordinance would promote this goal. Whether as a means to achieve its stated purpose rent control is a good idea is a political decision—one which properly rests with the legislative branch of government. We agree with *Yee* that this is "not a question of constitutional law for the courts." (*Yee* v. *City of Escondido, supra*, 224 Cal.App.3d at p. 1358.)

Appellants have not made a facial challenge to the rent control ordinance; they have challenged only the effect of its lack of a "vacancy decontrol" provision. They have not alleged, however, that the ordinance has failed to provide them a fair and reasonable return on their investment, or denied

them economically viable use of their land. Thus, even accepting the allegations of appellants' complaint as true, as we must for the purpose of this appeal from a dismissal on a demurrer, we conclude that under no construction of the facts could appellants make out a claim for a taking without just compensation. We will therefore affirm the order of dismissal.

## III. *Sanctions*

Last, the city has asked this court to sanction appellants for their citations to unpublished cases, in violation of California Rules of Court, rule 977, and to strike the offending references from their briefs. We declined appellants' request to take judicial notice of these decisions.

While respondent is correct that parties may not cite unpublished opinions, sanctions and striking are unnecessary. We have not reviewed, or relied on, any unpublished opinion so cited.

## DISPOSITION

The trial court's order is affirmed.

Capaccioli, Acting P. J., and Bamattre-Manoukian, J., concurred.

Appellants' petition for review was denied July 17, 1991. Baxter, J., did not participate therein. Panelli, J., was of the opinion that the petition should be granted.